UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-------------------------------------------------------------x

SUMMER HILL NURSING HOME LLC,                :               Index No.
111 Route 516
Old Bridge, New Jersey  08857,               :

                        Plaintiff,      :

          - against -                       :               **COMPLAINT**

MICHAEL O. LEAVITT, SECRETARY                :
OFFICE OF THE SECRETARY
U.S. DEPARTMENT OF HEALTH                     :
AND HUMAN SERVICES
Hubert H. Humphrey Building                   :
200 Independence Avenue, SW
Washington, DC  20201; and                    :

KERRY N. WEEMS, ADMINISTRATOR                 :
CENTERS FOR MEDICARE &
MEDICAID SERVICES                             :
U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES                            :
Hubert H. Humphrey Building
200 Independence Avenue, SW                   :
Washington, DC  20201,

                             :

                  Defendants.       :

Also Serve:
       The United States Attorney for the        :
       District of Columbia and the Attorney
       General of the United States.             :
-------------------------------------------------------------x


       Plaintiff, Summer Hill Nursing Home LLC, by its attorneys, Ira Daniel Tokayer,

Esq., and Buchanan Ingersoll & Rooney PC, as and for its complaint herein, alleges as follows:

THE PARTIES

       1.     Plaintiff Summer Hill Nursing Home LLC ("Summer Hill") is a limited

liability company existing and organized under the laws of the State of New Jersey.

2.     Defendant, Michael O. Leavitt, is the Secretary of the Department of Health and Humans Services ("HHS"). The Secretary is responsible for the administration of the Medicare program.

3.     Defendant Kerry N. Weems, is the Acting Administrator for the Centers for Medicare & Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA"). CMS is the operating component of HHS charged with the administration of the Medicare program through a delegation from, and as agent of the Secretary.

4.     CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries.

5.     At all relevant times, Mutual of Omaha Insurance Company was a fiscal intermediary (the "Intermediary").

JURISDICTION AND VENUE

6.     This action arises under the Medicare statute, 42 U.S.C. §§ 1395, et seq., and challenges the Final Administrative Decision (the "Decision") of the CMS Administrator, received by Plaintiff on or about December 20, 2007, which reversed Decision No. 2008-D5 of the Provider Reimbursement Review Board ("PRRB"), dated November 1, 2007, which reversed the Intermediary's adjustment of Summer Hill's crossover bad debts for the period ending December 31, 2004, on the ground that the Intermediary's adjustment had no foundation in law and was without proper authority under the Medicare statute, the regulations promulgated thereunder and CMS' Manual.

7.     Jurisdiction of the Court is based upon 42 U.S.C. § 1395oo(f)(1), 5 U.S.C. § 702 and 28 U.S.C. §§ 1331 and 1346.

8.    Venue is proper in this district pursuant to 42 U.S.C. § 1395oo(f)(1).

MEDICARE REGULATORY AND STATUTORY FRAMEWORK

9.    The Medicare program is a federally funded program established to provide

health insurance to the aged and disabled pursuant to 42 U.S.C §§ 1395, et seq.

10.    The Medicaid program is a joint state and federal funded program

authorized by the Federal Medicaid Act codified at Title XIX of the Social Security Act and 42

U.S.C. § 1396 et seq.

11.    Individuals who qualify for benefits under both the Medicare program as

aged or disabled and under the Medicaid program as indigent are known as "dual eligible"

individuals ("Dual Eligible" individuals).

12.    Pursuant to 42 C.F.R. § 413.80 (recodified to 42 CFR § 413.89), bad debts

are defined as amounts considered to be uncollectible from accounts and notes receivable that

were created or acquired in providing services.

13.    Pursuant to 42 C.F.R. § 413.80 (recodified to 42 CFR § 413.89), to assure

that covered service costs are not borne by others, bad debts attributable to the deductible and

coinsurance amounts that remain unpaid are added to the Medicare share of allowable costs and

are thus reimbursed by Medicare.

14.    Uncollectible amounts attributable to the deductible and coinsurance owed

by Dual Eligible individuals that are not otherwise paid by a state Medicaid program qualify as

bad debts and are to be included as allowable Medicare costs reimbursable to the Medicare

provider.

15.    To be reimbursed under Medicare for services provided, a provider submits

3

at the close of its fiscal year a cost report to the fiscal intermediary showing the costs it incurred and the portion of those costs to be allocated to Medicare.

16.    The fiscal intermediary reviews the cost report and determines the total amount of Medicare reimbursement due the provider.

17.    A provider dissatisfied with the fiscal intermediary's determination may file an appeal with the PRRB.

FACTS

18.    Summer Hill is a 120-bed skilled nursing facility located in Old Bridge, New Jersey, and is a provider of skilled nursing services.

19.    Summer Hill is a participating provider in both the federal Medicare program and the New Jersey Medicaid program.

20.    During fiscal year 2004, Summer Hill provided medically necessary care and services to a number of residents who were dually eligible for Medicare and Medicaid benefits ("Dual Eligible Residents").  Summer Hill is entitled to be reimbursed for such services under Medicare law.

21.    On or about May 31, 2005, Summer Hill submitted its Medicare cost report for the fiscal year ending December 31, 2004, claiming $170,537 in Medicare bad debts associated with deductibles and co-insurance amounts for Dual Eligible Residents who resided and received qualifying services at Summer Hill.

22.    In claiming the bad debts relating to its Dual Eligible Residents, Summer Hill relied upon the State of New Jersey's Medicaid payment formula to determine that Medicaid was not liable for any portion of the deductibles and coinsurance amounts attributable to the Dual

4

Eligible Residents and, thus, pursuant to Medicare law, such deductible and coinsurance amounts were to be allowable Medicare costs defined as bad debts.

23.    In addition, on or about November 29, 2005, in connection with an audit performed by the Intermediary, Summer Hill submitted to the Intermediary Medicaid Remittance Advices which had been received by Summer Hill as a result of bills Summer Hill submitted to the Medicaid Program for the Dual Eligible Residents, proving the validity of the claimed bad debt.

24.    On or about February 28, 2007, the Intermediary issued a Notice of Program Reimbursement, disallowing $135,106 of Summer Hill's claimed bad debts attributable to its Dual Eligible Residents solely on the ground that, despite the fact that Summer Hill had made the determination that its claimed bad debts were not reimbursable by New Jersey Medicaid, Summer Hill had not billed the State of New Jersey for each Dual Eligible Resident and received contemporaneous documentation from the State that such claims were denied. (the so-called "must bill" policy).

25.    On or about February 28, 2007, in response to the Intermediary's denial of reimbursement for its claimed bad debts, Summer Hill requested a hearing before the PRRB.

26.    The first basis for Summer Hill's appeal of the Intermediary's denial of reimbursement for the majority of its claimed bad debts was that the Intermediary's application of the "must bill" policy was not authorized by statute or regulation and was inconsistent with the applicable CMS program guidance manuals.

27.    The second basis for Summer Hill's appeal was that Summer Hill had, in fact, satisfied the underlying purpose for the "must bill" policy by obtaining statements from the New Jersey Medicaid program that proved that all claimed bad debts were not reimbursable by

the Medicaid program and were therefore lawfully claimed as bad debts as defined under

Medicaid law.

        28.     On November 1, 2007, in a unanimous decision, the PRRB found for

Summer Hill on the first basis of its appeal and reversed the determination of the Intermediary on

the ground that the Medicare statute, regulations and manual do not contain a "must bill" policy

requirement for Dual Eligible Residents. Rather, the PRRB determined, as stated in the governing

statute and CMS' own program guidance manuals, a provider must only make reasonable

collection efforts and apply sound business judgment to determine if the debt was actually

uncollectible, which Summer Hill had done in this case.

        29.     Further, the PRRB found that CMS' only notification to Medicare

participating providers of the "must bill" policy, namely a Newsletter, dated October 15, 2003,

was insufficient authority for the imposition of an additional major requirement for bad debt

reimbursement such as the "must bill" policy in that it was unsupported by statute or regulation

and went well beyond the regulations and applicable provisions of CMS' program guidance

manuals.

        30.     Because it found in Summer Hill's favor with respect to CMS' lack of

authority to impose the "must bill" policy, the PRRB did not address Summer Hill's alternate

basis for appeal, namely that it had proved its compliance with underlying purpose of the "must

bill" policy by obtaining proof from the State of New Jersey that the bad debt it attributed to its

Dually Eligible Residents was not reimbursable by Medicaid and was therefore properly claimed

on the 2004 cost report.

        31.     In or about November 2007, the Intermediary and CMS' Center for

Medicare Management sought review of the PRRB decision with the Administrator of CMS (the "Administrator"). In its brief to the Administrator, Summer Hill asserted both of the bases for its claim to payment described in ¶¶ 26 and 27 above.

32.    On December 20, 2007, the Administrator issued its Decision reversing the PRRB and reinstating the finding of the Intermediary denying reimbursement of the majority of Summer Hill's claimed bad debt based solely upon Summer Hill's alleged failure to comply with the "must bill" policy (the "Decision"). The Administrator did not address Summer Hill's substantial compliance argument.

33.    Because it only reversed the broad policy decision of the PRRB concerning the proper authority for the "must bill" policy, the Administrator did not address Summer Hill's alternate basis for appeal before the PRRB, which was again raised before the Administrator. Specifically, the Administrator failed to address the fact that the evidence in the record, namely the Medicaid Remittance Advices obtained by Summer Hill from New Jersey Medicaid, prove Summer Hill's compliance with underlying purpose of the "must bill" policy in that the bad debt it attributed to its Dually Eligible Residents was not reimbursable by Medicaid and was therefore properly claimed.

34.    Summer Hill files the within action pursuant to 42 U.S.C. § 1395oo(f)(1), which provides that a provider may obtain judicial review of a final decision of the PRRB or a reversal, affirmation or modification by the Administrator of a PRRB decision by filing a civil action within 60 days of the date on which the provider receives notice of a final decision of the PRRB or the Administrator. Such final notice was received by Summer Hill on or about December 20, 2007.

### FIRST CLAIM

35.     Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

36.     The Decision is arbitrary capricious, an abuse of discretion, not in accordance with the law, unsupported by the record, in excess of the Administrator's authority, and contrary to plaintiff's constitutional rights and/or privileges within the meaning of the Administrative Procedure Act, 5 U.S.C. Section 706(2), in that the "must bill" policy is not necessary, without authority and contravenes the statutory prohibition on cost-shifting and the requirement that Medicare reimburse providers for expenses actually incurred serving Medicare beneficiaries, among other things.

### SECOND CLAIM

37.     Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

38.     The Decision is arbitrary capricious, an abuse of discretion, not in accordance with the law, unsupported by the record, in excess of the Administrator's authority, and contrary to plaintiff's constitutional rights and/or privileges within the meaning of the Administrative Procedure Act, 5 U.S.C. Section 706(2), in that Summer Hill complied with the "must bill" policy by receiving Medicaid Remittance Advices establishing that no payment was due Summer Hill from Medicaid for Dual Eligible Residents.

### THIRD CLAIM

39.     Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

40.     The Decision violates the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

## FOURTH CLAIM

41.     Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

42.     The Decision violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

WHEREFORE, Plaintiff demands judgment reversing and setting aside the Decision as arbitrary and capricious, an abuse of discretion, not in accordance with law, unsupported by the record, in excess of the Administrator's authority and contrary to Plaintiff's constitutional rights and/or privileges; remanding the case with directions that the PRRB decision be reinstated and affirmed and/or that Plaintiff be reimbursed because of substantial compliance; and, in the alternative, permitting Plaintiff to re-file its 2005 cost study to include Medicare bad debts previously filed in connection with Plaintiff's 2004 cost study for which Medicaid Remittance Advices were received in 2005; together with the costs and disbursements of this

action; attorney's fees as permitted by law; and for such other and further relief as to this Court

seems just and proper.

Dated:  New York, New York
        February 18, 2008


                                               _____ (IT 4734)
                                            Ira Daniel Tokayer, Esq.
                                            42 West 38th Street, Suite 802
                                            New York, New York  10018
                                            imtoke@mindspring.com
                                            (212) 659-5250


                                            BUCHANAN INGERSOLL & ROONEY PC

                                          By: _____ (DC Bar #142745)
                                          John H. Korns, Esq.
                                          1700 K Street, NW, Suite 300
                                          Washington, DC  20006-3807
                                          john.korns@bipc.com
                                          (202) 452-7939



# PROVIDER REIMBURSEMENT REVIEW BOARD
## DECISION
ON THE RECORD
2008-D5

**PROVIDER -**
Summer Hill Nursing Home
Old Bridge, New Jersey

Provider No.: 31-5381

vs.

**INTERMEDIARY -**
Mutual of Omaha Insurance Company

**DATE OF HEARING -**
August 17, 2007

Cost Reporting Period Ended -
December 31, 2004

**CASE NO.:** 06-1478

## INDEX

Page No.

| | |
|---|---|
| Issue............................................................................................................................................ | 2 |
| Medicare Statutory and Regulatory Background........................................................... | 2 |
| Statement of the Case and Procedural History............................................................. | 2 |
| Parties Contentions.................................................................................................................... | 3 |
| Findings of Fact, Conclusions of Law and Discussion............................................... | 4 |
| Decision and Order.................................................................................................................... | 6 |

## ISSUE:

Whether the Intermediary properly adjusted Medicare bad debts.

## MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the proper amount of Medicare reimbursement due a provider of medical services.

The Medicare program was established to provide health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (DHHS) charged with administering the Medicare program. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due the providers under Medicare law and under interpretive guidelines published by CMS. See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803. A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo(a); 42 C.F.R. §405.1835.

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Summer Hill Nursing Home (Provider) is a 120-bed skilled nursing facility located in Old Bridge New Jersey. In its cost report for FYE 12/31/04, the Provider claimed $170, 537 in Medicare bad debts of which $135,106 was disallowed by Mutual of Omaha, its fiscal intermediary (Intermediary). The Intermediary reviewed the Provider's collection and bad debt write-off policies and found that the Provider applied the New Jersey Medicaid payment formula to determine the State's liability for any portion of the coinsurance due from patients who were dually eligible for both Medicare and Medicaid. The Provider billed the State only in those instances where it determined that a liability existed. Where the calculations determined no liability, the Provider considered the outstanding coinsurance amount uncollectible and claimed a Medicare bad debt in that amount. The Intermediary disputed the propriety of writing off those amounts without billing the State for each patient and receiving contemporaneous documentation of a payment or a denial. There is no dispute that 42 C.F.R. §413.80 and CMS 15-1, Sections 308, 310 and 312 are controlling for the reimbursement of bad debts. The dispute centers on the application of the guidance to determine uncollectibility.

## PARTIES' CONTENTIONS:

The Provider asserts that it has established the "uncollectible" nature of the amounts that it claimed as bad debts in accordance with the "must bill" policy of Section 1102.3L of the Provider Reimbursement Manual (PRM)-II. The Provider claims that the Medicaid Remittance Advice[1] demonstrates that the Provider has billed Medicaid for each of the bad debts claimed and that Medicaid determined that, because the Medicare payment exceeded the Medicaid allowable payment ceiling, no Medicaid payment was due. The Provider acknowledges that the billing occurred after the bad debt was written off but argues that no statute or regulation requires that Medicaid be billed and the bill be denied by Medicaid prior to the Provider claiming dual eligible bad debts. Rather, 42 C.F.R. §413.80(e) requires that reasonable collection efforts be made and that the amount be actually "uncollectible when claimed." The Provider contends that its bad debt policy of applying the New Jersey Medicaid payment formula to determine if the State was liable and then billing the State only if there was liability constitutes a reasonable collection effort. The Medicaid remittance advice affirmed the Provider's determination and, the Provider argues that no source other than the patient would be legally responsible for the patient's medical bill.

In the alternative, the Provider argues that denying bad debts pursuant to the "must bill" policy: 1) goes beyond existing statutory requirements and regulations 2) is arbitrary, capricious and unreasonable in violation of APA, 5 U.S.C. §706(2)(A) and 42 U.S.C. §405; 3) violates the statutory prohibition on cost shifting set forth in 42 U.S.C. §1395x(v)(1)(A); and 4) contravenes the requirements of 42 U.S.C. §1395f(b)(1) that Medicare reimburse providers for expenses actually incurred to serve Medicare beneficiaries.

The Intermediary contends that the Provider's method for writing off bad debts of dually eligible patients without billing the State does not constitute a reasonable collection effort as contemplated by the regulations at 42 C.F.R. §413.89(e) or the manual provisions at CMS Pub. 15-1 §308. The Provider's policy of calculating what the State would pay rather than submitting a bill for each patient fails to establish the fact that "no source other than the patient would be legally responsible for the patient's medical bill. . . . ."[2] The Intermediary argues further that the "must bill" policy is a reasonable reading of the regulations that has been upheld by the CMS Administrator[3] and the courts.[4]

The Intermediary also contends that the Provider received notification of the "must bill" policy on September 12, 2003 when CMS issued Change Request 2796.[5] This Request changed the language in CMS Pub. 15-2, Section 1102.3L to revert back to the pre-1995 language that

---

[1] Exhibit P-3.

[2] CMS Pub. 15-1 §312C

[3] See, California Hospitals 90-91 Outpatient Crossover Bad Debts Group v. Blue Cross and Blue Shield of Association/ Blue Cross of California/Mutual of Omaha/Aetna Life Insurance Company. CMS Adm. Dec., October 31, 2000 reversing PRRB Dec. No. 2000-D80. Intermediary Exhibit I-4.

[4] See, Community Hospital of Monterey Peninsula v. Thompson, U.S. Court of Appeals, Ninth Circuit, 02-15115, (March 18, 2003). Intermediary Exhibit I-5.

[5] See, Intermediary Exhibit I-6.

required providers to bill the individual states for dual eligible beneficiary co-payments before claiming a Medicare bad debt. The Intermediary communicated this change to all providers in its Medicare Newsletter dated October 15, 2003.[6] The newsletter required that bad debts for dual eligible patients' deductibles and coinsurance must be documented by a billing to the welfare agency for each amount and receipt of a partial or total denial of the claim. The newsletter stated further:

> We cannot accept other forms of documentation such as a provider's calculations of the agency's liability for the debt or an affidavit from the provider's employee that they were instructed not to bill by the agency.

In its Joint Signature Memorandum 370 (JSM-370) dated August 10, 2004, CMS reiterated its "must bill" policy and issued a directive to all fiscal intermediaries to hold harmless providers that could demonstrate that they followed the instructions previously laid out at PRM-II Section 1102.3L for open cost reporting periods beginning prior to January 1, 2004.[7]

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

After consideration of Medicare law and guidelines, the parties' contentions and the evidence included in the record, the Board finds and concludes as follows:

The primary issue before the Board is whether a finding of uncollectibility on a debt owed by a patient who is dually eligible for Medicare and Medicaid must be supported by an individual billing to the state. The Board examined the regulations at 42 C.F.R. §413.80 and the program guidance at CMS Pub. 15-1, Sections 308, 310, 312, and 322 that govern the recognition of Medicare bad debts as well as the newsletters and agency alerts cited by the parties in their respective position papers.

Based on the Board's examination of the regulation at 42 C.F.R. §413.80 and the program guidance at CMS Pub. 15-1, Section 308, it finds that neither contained a requirement to bill. Rather, the sections require that a provider make reasonable collection efforts and apply sound business judgment to determine if the debt was actually uncollectible. CMS Pub. 15-1, Section 310 sets the parameters for establishing reasonable collection efforts. However, the section specifically refers to Section 312 for indigent and/or medically indigent patients and, by its own terms, is inapplicable in determining reasonable collection efforts for indigent patients.

It states in pertinent part:

> Providers can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid as either categorically needy individuals or medically needy individuals, respectively. Otherwise, the provider should apply its customary methods for determining the

---

[6] See, Intermediary Exhibit I-7.

[7] See, Intermediary Exhibit I-8.

> indigence of patients to the case of the Medicare beneficiary under the following guidelines: … (emphasis added)

CMS Pub. 15-1 Sections 312.

The plain language of this paragraph establishes that Medicaid-eligible beneficiaries are indigent and that a provider does not have to apply additional steps to prove their indigency. Immediately following the quoted paragraph, subsections A through D set forth specific requirements regarding how and by whom indigence is to be determined and how that determination is to be documented by a provider. Subsection C states:

> The provider must determine that no source other than the patient would be legally responsible for the patient's medical bill; e.g., title XIX, local welfare agency and guardian; . . .

The subsection C language imposes a universal requirement to collect the debt from responsible third parties. However, the Board finds that the use of the word "otherwise" in the first paragraph effectively makes sub-sections A-D applicable to non-Medicaid eligible beneficiaries only. Further, the duty imposed by subsection C to collect from responsible third parties still does not rise to a specific billing requirement. Nowhere does the language of this section support the conclusion that uncollectibility must be established by a billing and denial of payment.

CMS Pub. 15-1, Section 322, Medicare Bad Debts under State Welfare programs, provides that deductible and coinsurance amounts not covered by state title XIX plans may be claimed as Medicare bad debts if they meet the requirements of sections 312 or 310. Section 322 states in pertinent part:

> Where the State is obligated to either by statute or under the terms of its plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare. Any portion of such deductible and coinsurance amounts that the State is not obligated to pay can be included as a bad debt under Medicare, provided the requirements of §312 or, if applicable, §310 are met.

The Board finds no billing requirement in Sections 310 or 312. Accordingly, the Board concludes that no billing requirement is imposed by either the bad debt regulations or the manual provisions.

The Intermediary relies on its Newsletter dated October 15, 2003,[8] as evidence of a "must bill" requirement. At its page 3, the Newsletter states:

---

[8] See, Intermediary Exhibit I-7.

Page 6                                                                CN: 06-1478

> A provider must demonstrate that a debt was uncollectible when claimed as
> worthless. With respect to a dual eligible, this can only be done by billing the
> welfare agency for each deductible and coinsurance amount and receiving a
> partial or total denial of the claim.

The Newsletter is the only evidence in the record that such a billing is required. However, the
Board finds the Newsletter, while explicit, is unsupported by a statute or regulation and is,
therefore, insufficient to impose an additional major requirement for bad debt reimbursement.
The Newsletter goes well beyond the requirements of the regulation and manual provisions
because it clearly requires that such billings be made even when they are futile, a provider can
otherwise demonstrate that there is no reasonable expectation of payment, and the debt was
worthless when it was claimed. Accordingly, the Board concludes that the application of the
"must bill" policy to outstanding deductible and coinsurance amounts due from dually eligible
beneficiaries is improper.

DECISION AND ORDER:

The Intermediary's "must bill" policy has no foundation in law in that it is beyond the
requirements of the regulations and manual. Application of the "must bill" policy to outstanding
deductibles and coinsurance amounts due from dually eligible beneficiaries is improper. The
Intermediary's adjustment is reversed.

BOARD MEMBERS PARTICIPATING:

Suzanne Cochran, Esquire
Elaine Crews Powell, C.P.A.
Anjali Mulchandani-West, C.P.A.
Yvette C. Hayes

FOR THE BOARD:
  NOV 0 1 2007

Suzanne Cochran, Esquire
Chairperson



**Medicare**

November 14, 2007

Jacqueline R. Vaughn, Director
Office of the Attorney Advisor
Centers for Medicare & Medicaid Services
Mail Stop: C3-01-20
7500 Security Boulevard
Baltimore, Maryland 21244-1850

VIA FACSIMILE 410-786-0043

Re:  **Intermediary's request that the Administrator review a PRRB decision**
Summer Hill vs. Mutual of Omaha (now serviced by Wisconsin Physicians Service)
Provider No: 31-5381
FYE – 12/31/2004
PRRB Case No. 06-1478
Decision No. 2008-D5

Dear Ms. Vaughn:

Wisconsin Physicians Service (Intermediary) has assumed the responsibility for providers previously serviced by Mutual of Omaha.

The PRRB rendered its decision on the above-mentioned case on November 1, 2007. The Intermediary received this decision on November 5, 2007; therefore, the Intermediary's written request for the Administrator to review a PRRB decision is due within 15 days of receipt, or by November 20, 2007.

The Intermediary requests that the Administrator review the Provider Reimbursement Review Board's (the Board) decision.

The Board made an erroneous interpretation of the regulation at 42 C.F.R. § 413.80(e) that describes the criteria a bad debt must meet to be allowable. The regulation requires the bad debt to be actually uncollectible when claimed as worthless. In this case, the Provider claimed the bad debts as worthless prior to determining the State would not pay the outstanding deductible and coinsurance amounts. Therefore, the Provider claimed amounts that do not meet the bad debt criteria.

The Administrator should reverse the decision by the Board "that the application of the 'must bill' policy to outstanding deductibles and coinsurance amounts due from dually eligible beneficiaries is improper".

Please direct any correspondence to either our post office box or overnight delivery address.



Wisconsin Physicians Service Insurance Corporation serving as a CMS Medicare Contractor
P.O. Box 1787 • Madison, WI 53701 • Phone 608-221-4711

The post office box address for return mail is:          The street address for overnight delivery is:

Wisconsin Physicians Service                            Wisconsin Physicians Service Medicare 7
PO Box 1604                                             3333 Farnam Street
Omaha, NE  68101                                        Omaha, NE  68131

Thank you for your consideration of our comments on this issue.

Sincerely,

*Terry Gouger*

Terry Gouger
Supervisor Cost Report Appeals
Wisconsin Physicians Service

cc:     Mr. John L. Fazzio
        Zimmet Healthcare Services Group, LLC

2

11/30/2007  12:54   17329788736                ZIMMET HEALTHCARE                    PAGE  02/03



DEPARTMENT OF HEALTH & HUMAN SERVICES                     Centers for Medicare & Medicaid Servi

**NOV 2 0 2007**                                                                 7500 Security Boulevard
                                                                                Baltimore, MD 21244-1850

FROM:       Director
            Chronic Care Policy Group
            Center for Medicare Management

TO:         Director
            Office of the Attorney Advisor

SUBJECT:    Provider Reimbursement Review Board (PRRB) Decision Number
            2008-D5 (Summer Hill Nursing Home; Provider No.: 31-5381)

In this case, Summer Hill Nursing Home claimed $170,537 in Medicare bad debts for fiscal year
ending (FYE) December 31, 2004.  The Medicare fiscal intermediary (Mutual of Omaha)
disallowed $135,106 associated with unpaid Medicare deductibles and coinsurance amounts for
dual-eligible beneficiaries.  Before a provider can be paid on its cost report for bad debts related
to unpaid Medicare deductible and coinsurance amounts for dual-eligible beneficiaries Medicare
policy requires a determination and documentation of the State's liability for those cost-sharing
·amounts.  To effectuate this, Medicare has required the provider to bill the State to determine
that the State is not liable for payment – referred to as the "must bill" policy as required by
Chapter 3 of the Provider Reimbursement Manual (PRM), Part 1.  This allows a claim by claim
adjudication of the State's cost-sharing liability.  CMS clearly outlined the "must bill" policy for
reimbursement of dual eligible beneficiaries in JSM-370 issued on August 03, 2004.

Section 413.89 (e) of the regulations stipulates that a bad debt must meet the following criteria to
be allowable:

   (1) The debt must be related to covered services and derived from deductible and
       coinsurance amounts.
   (2) The provider must be able to establish that reasonable collection efforts were made.
   (3) The debt was actually uncollectible when claimed as worthless.
   (4) Sound business judgment established that there was no likelihood of recovery at any time
       in the future.

To comply with section 413.89(e)(2), section 310 of the PRM; Reasonable Collection Effort,
states that a reasonable collection effort must involve the issuance of a bill on or shortly after
discharge or death of the beneficiary to the party responsible for the patient's personal financial
obligations (emphasis added).  Section 310 refers to section 312 for indigent and medically
indigent patients.

Under section 312 of the PRM; Indigent or Medical Indigent Patients, the provider can deem
Medicare beneficiaries indigent or medically indigent when such individuals have also been
determined eligible for Medicaid as either categorically needy individuals or medically needy
individuals, respectively (emphasis added).  Once indigence is determined, the debt may be
deemed uncollectible without applying the section 310 procedures, however, the provisions of

11/30/2007  12:54    17329700736    ZIMMET HEALTHCARE    PAGE  03/03

CMS' must bill policy concerning dual-eligible beneficiaries continues to be critical because individual states run their Medical Assistance programs differently and maintain billing and documentation requirements unique to each state program. Of most importance is a Medicaid eligibility category known as a qualified Medicare beneficiary (QMB) which was enacted by the Medicare Catastrophic Act of 1988- after the latest changes to Chapter 3 of the PRM of January 1983. QMBs are individuals who meet the definition in 1905(p)(1) of the Social Security Act. All QMBs are Medicare beneficiaries, entitled to the full range of Medicare-covered services and Medicare provider options, without regard to whether those services are covered under the Medicaid State Plan, and are eligible for Medicaid payment of their Medicaid cost-sharing expenses. Section 1905(p)(3) of the Social Security Act ("Act") imposes liability for cost-sharing amounts for QMBs on the States, though Section 1902(n)(2) allows the States to limit that amount to the Medicaid rate and essentially pay nothing toward dual eligibles' cost-sharing if the Medicaid rate is lower than what Medicare would pay for the service. However, in most cases the State will always be liable to pay for a beneficiary's unpaid deductible amounts. Again, we believe that the State maintains the most current and accurate information to determine if the beneficiary is a QMB, at the time of service, and the State's liability for any unpaid QMB deductible and coinsurance amounts through the State's issuance of a remittance advice after being billed by the provider.

Therefore, we believe that a provider must bill the State and the State process the bills/claims to produce a remittance advice for each beneficiary to determine their Medicaid status, at the time of service and the State's liability for unpaid Medicare deductible and coinsurance amounts. Thus, it is unacceptable for a provider to write off a Medicare bad debt as worthless without first billing the State. Even if the provider has calculated that the State has no liability for outstanding deductible and coinsurance amounts, the provider must bill the State and receive a remittance advice before claiming a bad debt as worthless because, as stated above, the State has the most current and accurate information to make a determination.

After review of the Board's decision and all relevant facts, the Chronic Care Policy Group believes that the bad debts claimed by the provider were not worthless when written off as Medicare bad debts on their FYE December 31, 2004 cost report. The provider did not bill the State and receive a remittance advice to meet the reasonable collection effort requirements in 42 CFR 413.89(e)(2) and Chapter 3 of the PRM . Therefore, we recommend reversal of this decision.

Sincerely,

Laurence D. Wilson
Director
Chronic Care Policy Group
Center for Medicare Management

11/28/2007  09:38    17329708736                    ZIMMET HEALTHCARE              PAGE  02/03
11/23/2007  08:31    4187060043                     CMS                           PAGE  02

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Phone 410-786-3176 Facsimilies 410-786-0043



Office of the Attorney Advisor
VIA FACSIMILE

John Fazzio                              NOV 2 7 2007
Zimmet Healthcare Services Group, LLC
4006 Highway 9 South
Morganville, NJ 07751
Fax: 732-970-0736

Re:    Summer Hill vs. Mutual of Omaha, PRRB Decision No. 2008-D5 (11/01/07) (FYE
       12/31/04)

Dear Mr. Fazzio:

This is to notify you that the Administrator of CMS will review the Provider
Reimbursement Review Board's (Board's) decision concerning whether the Intermediary
properly adjusted Medicare bad debts. Our office has received comments from the
Intermediary and the Centers for Medicare & Medicaid Services, Center for Medicare
Management, requesting that the Administrator review the Board's decision.

Involved will be whether the Board's decision is in keeping with the pertinent laws,
regulations, and other criteria cited by the Board and by the parties in their comments.
The Board's decision will be reviewed in light of prior decisions of the Administrator and
relevant court decisions.   Accordingly, this case will be before the Administrator within
the next few weeks to determine whether to reverse, affirm, modify or remand the
Board's decision.

The governing regulations published at 42 C.F.R. § 405.1875 explains the procedures in
conducting final agency review of decisions made by the Board. You have a right to
submit comments within 15 days of your receipt of this letter. If you do submit
**comments, we would appreciate your faxing them to this office at (410) 786-0043, in
order to ensure receipt of the comments by this office.**

CMD                                                         PAGE   03

An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision.  I will promptly send you a copy of the decision after it is rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

Cc:    Terry Gouger, Wisconsin Physicians Service
       Center for Medicare Management, CMS



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



CENTERS for MEDICARE & MEDICAID SERVICES

Office of the Attorney Advisor

DEC 2 1 2007

**VIA CERTIFIED MAIL**

Mr. John Fazzio
Zimmet Healthcare Services Group, LLC
4006 Route 9 South
Morganville, NJ 07751

Re: <u>Summer Hill Nursing Home</u>, PRRB Decision No. 2008-D5

Dear Mr. Fazzio:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board. This constitutes the final administrative decision of the

Secretary of the Health and Human Services. Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc: Mr. Terry Gouger, Intermediary's Representative

## CENTERS FOR MEDICARE AND MEDICAID SERVICES
### *Decision of the Administrator*

| | |
|---|---|
| In the case of:<br><br>**Summer Hill Nursing Home**<br><br><br>Provider<br>vs.<br><br>**Mutual of Omaha Insurance Company**<br><br><br>Intermediary | Claim for:<br><br>**Determination for Cost Reporting Period Ending: December 31, 2004**<br><br><br>Review of:<br>**PRRB Dec. No. 2008-D5**<br>**Dated: November 1, 2008** |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f) (1) of the Social Security Act (Act), as amended (42 USC 1395oo (f)). The Intermediary and CMS' Center for Medicare Management (CMM) commented, requesting Administrator's review. The parties were then notified of the Administrator's intention to review the Board's decision. The Provider submitted comments requesting that the Board's decision be affirmed. Accordingly, the case is now before the Administrator for final administrative decision.

### BACKGROUND

The Provider is a 120-bed skilled nursing facility located in Old Bridge New Jersey. In its cost report for fiscal year ending (FYE) 12/31/04, the Provider claimed $170,537 in Medicare bad debts of which $135,106 was disallowed by the Intermediary. The Intermediary reviewed the Provider's collection and bad debt write-off policies and found that the Provider applied the New Jersey Medicaid payment formula to determine the State's liability for any portion of the coinsurance due from patients who were dually eligible for

both Medicare and Medicaid. The Provider billed the State only in those instances where it determined that a liability existed. Where the calculations determined no liability, the Provider considered the outstanding coinsurance amount uncollectible and claimed a Medicare bad debt in that amount. The Intermediary disputed the propriety of writing off those amounts without billing the State for each patient and receiving contemporaneous documentation of a payment or a denial.

## ISSUE AND BOARD'S DECISION

The issue, set forth by the Board, was whether the Intermediary properly adjusted Medicare bad debts. The Board focused its decision-making on whether a finding of uncollectibility on a debt owed by a patient who is dually eligible for Medicare and Medicaid must be supported by an individual billing to the State.

The Board examined the regulation at 42 CFR §413.80 and the program guidance at CMS Pub. 15-1, Sections 308, 310, 312 and 322 of the Provider Reimbursement Manual (PRM), that govern the recognition of Medicare bad debts, as well as the newsletters and agency alerts cited by the parties in their respective position papers. Based on this examination, the Board concluded that the existing bad debt regulation and manual provisions do not contain any billing requirements. Rather, these sections require that a provider make reasonable collection efforts and apply sound business judgment to determine if the debt was actually uncollectible.

The Board did recognize that a particular Newsletter was the only evidence in the record that substantiated that such billing is required. However, the Board found that the Newsletter, while explicit, is unsupported by a statute or regulation and is insufficient to impose an additional major requirement for bad debt reimbursement, since it goes beyond the scope of the existing regulation and manual provisions.

## SUMMARY OF COMMENTS

The Intermediary submitted comments, requesting reversal of the Board's decision. The Intermediary asserted that the regulatory criteria at 42 CFR 413.80(e) for Medicare bad debt payment were not met because there was no collection effort since the Providers did not bill the State. The Provider claimed the bad debts as worthless prior to determining the State would not pay the outstanding deductible and coinsurance amounts. Therefore, the Administrator should reverse the decision by the Board.

CMM explained that before a provider can be paid for bad debts relating to unpaid Medicare deductibles and coinsurance amounts for dual-eligible beneficiaries, Medicare policy requires a determination and documentation of the State's liability for those cost-sharing amounts. To effectuate this, Medicare required the provider to bill the State to determine that the State is not liable for payment -- referred to as the "must bill" policy as required by chapter 3 of the PRM. This policy allows a claim by claim adjudication of the State's cost-sharing liability.

CMS outlined the "must bill" policy in a Joint Signature Memorandum (JSM)-370 issued August 3, 2004 which stated that "in those instances where the state owes none or only a portion of the dual-eligible patient's deductible or co-pay, the unpaid liability for the bad debt is not reimbursable to the provider by Medicare until the provider bills the State, and the State refuses payment (with a State remittance advice). Even if the State Plan Amendment limits the liability to the Medicaid rate, by billing the state, a provider can verify if the current dual-eligible status of a beneficiary and can determine whether or not the State is liable for any portion thereof."

CMM maintained that, in order for bad debts to be reimbursable under Medicare, they must meet the criteria set forth in the regulation and the guidelines in the PRM. Specifically, CMM stated, *inter alia*, that under the section 322 of the PRM, any portion of Medicare deductible or coinsurance amounts that a State is not obligated to pay can be included as a bad debt provided that the requirements of section 312 of the PRM are met. Further, Section 312 of PRM states that the provider must determine that no source other than the patient would be legally responsible for the patient's medical bill.

In this case, it is undisputed that the State bears liability for some portion of the coinsurance and deductible amounts for services rendered to dually-eligible beneficiaries. However, the provider did not comply with specific requirements under section 1102.3L of the PRM (Part II), which requires the provider to submit specific documentation such as evidence that the patient is eligible for Medicaid; copies of bills for Medicare deductibles and coinsurance that were sent to the State; and copies of the remittance advice from the State showing the amount of the provider's claims for deductibles and coinsurance. Thus, since the Provider failed to bill the State, and did not comply with these requirements, the Provider's bad debts are not reimbursable under Medicare.

Finally, CMM supports consistent application of the "must bill" policy by stating that CMS' "must bill" policy for dual-eligible beneficiaries has been upheld in the decision of the Ninth Circuit federal court in Community Hospital of the Monterey Peninsula v. Thompson, 323 F.3d 782 (9th Cir. 2003).

4

The Provider commented, requesting affirmation of the Board's decision. The Provider maintained that the Board correctly held that Medicare law does not mandate the State's remittance advice as the only documentation to support crossover bad debt. The Provider argued that the Board correctly determined that the regulation and manual provisions do not contain a "must bill" requirement. The Provider asserted that it had established that the bad debts were actually uncollectible "when claimed as worthless" through its own straight-forward determination which was later confirmed by the remittance advices received from Medicaid.

The Provider further argued that in this case all of the patients for which bad debts were claimed were previously determined by the State to be "categorically needy" or "medically needy". As a result, these individuals were deemed indigent, their debts were deemed uncollectible and no "must bill" policy applies under the provisions of Section 312 of the PRM.

Finally, the Provider asserted that the required remittance advices were received from Medicaid which conclusively establishes the debts to be "actually uncollectible when claimed" and therefore acknowledges the validity of the bad debts that were claimed. Since this point was never challenged by the Intermediary, this point was effectually conceded and accordingly the Board's decision should be affirmed.

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments were received timely and are included in the record and have been considered. After a review of the record, applicable regulations and manual instructions, the Board's decision should be reversed.

The Medicare program primarily provides medical benefits to eligible persons over the age of 65, and consists of two parts: Part A [42 U.S.C. §1395(c)-1395(i)], which provides reimbursement for inpatient hospital and related post-hospital, home health and hospice care; and Part B [42 U.S.C. §1395(j)-1395(w)], which is a supplementary voluntary insurance program for hospital outpatient services, physician services and other services not covered under Part A. Medicare providers are reimbursed by the Medicare program through fiscal intermediaries for Part A and carriers for Part B, under contract with the Secretary.

To be covered by Part B, a Medicare-eligible person must pay limited cost-sharing in the form of premiums, and deductible and coinsurance amounts. Where a Medicare beneficiary is also a Medicaid recipient, (i.e., "dually eligible"), a State Medicaid agency may enter into a buy-in agreement with the Secretary. Under such an agreement, the State enrolls the poorest Medicare beneficiaries, those eligible for Medicaid, in the Part B program by entering into an agreement with the Secretary and by paying the Medicare premiums and deductibles and coinsurance for its recipients as part of its Medicaid program.

Under Section 1861(v)(1)(a) of the Act, providers are to be reimbursed the reasonable cost of providing services to Medicare beneficiaries. That section defines "reasonable cost" as "the cost actually incurred, excluding therefrom any part of the incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included...." The section does not specifically address the determination of reasonable cost, but authorizes the Secretary to prescribe methods for determining reasonable cost, which are found in regulations, manuals, guidelines, and letters.

The principles set forth in the Act are reflected and further explained in the regulations. One of the underlying principles set forth in the Act is that Medicare shall not pay for costs incurred by non-Medicare beneficiaries, and vice-versa, i.e., Medicare prohibits cross-subsidization of costs. This principle is reflected at 42 CFR 413.9(c), which provides that the determination of reasonable cost must be based on costs related to the care of Medicare beneficiaries. However, if the provider's costs include amounts not reimbursable under the program, those costs will not be allowed.

Consistent with this principle, 42 CFR 413.80(a)[1] provides that bad debts, which are deductions in a provider's revenue, are generally not included as "allowable costs" under Medicare. The regulation at 42 CFR 413.80(b)(1) defines "bad debts" as "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services. "Accounts receivable" and "notes receivable" are defined as designations for claims arising from the furnishing of services, and are collectable in money in the relatively near future.

However, the regulation at 42 CFR 413.80(d)(1) explains that to ensure that the cost of Medicare services are not borne by others, the costs attributable to the Medicare deductible and coinsurance amounts which remain unpaid are added to the Medicare share of allowable costs. The circumstances under which providers may be reimbursed for the bad debts

---

[1] The regulation at 42 CFR 413.80, e. seq., has been redesignated to 42 CFR 413.89, et seq. See 69 Fed. Reg. 49254 (Aug. 11, 2004).

derived from uncollectible deductibles and coinsurance amounts are set forth at paragraph (e). The regulation at 42 CFR 413.80(e) states that to be allowable, a bad debt must meet the following criteria:

> 1) The debt must be related to covered services and derived from deductible and coinsurance amounts

> 2) The provider must be able to establish that reasonable collection efforts were made.

> 3) The debt was actually uncollectible when claimed as worthless.

> 4) Sound business judgment established there was no likelihood of recovery at any time in the future.

To comply with section 42 CFR 413(e)(2), the Provider Reimbursement Manual or PRM provides further guidance with respect to the payment of bad debts. Section 310 of the PRM provides the criteria for meeting reasonable collection efforts. A reasonable collection effort, *inter alia*, includes:

> *the issuance of a bill* on or shortly after discharge or death of the beneficiary *to the party responsible for the patient's personal financial obligations*.... (See section 312 for indigent or medically indigent patients.) (Emphasis added.)

Moreover, Section 310.B states that the provider's collection effort is to be documented "in the patients file by copies of the bill(s)...." Section 312 of the PRM explains that individuals who are Medicaid eligible as either categorically or medically needy may be automatically deemed indigent. However, §312.C requires that:

> The provider must determine that *no source other than the patient* would be legally responsible for the patient's medical bills; e.g., *title XIX*, local welfare agency and guardian.... (Emphasis added.)

Finally, section 312 also states that:

> once indigence is determined, and the provider concludes that there had been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible without applying the §310 [reasonable collection effort] procedures. (See section 322 of the PRM for bad debts under State welfare programs.)

Relevant to this case, section 322 of the PRM notes that:

> Effective with the 1967 amendments, States no longer have the obligation to pay deductible and coinsurance amounts for services that are beyond the scope of the State title XIX plan for either categorically needy or medically needy persons....

> Where the State is obligated either by statute or under the terms of its plan to pay all, *or any part of* the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare. Any portion of such deductible or coinsurance amounts that the State is not obligated to pay can be included as a bad debt under Medicare provided that the requirements of §312 or, if applicable, §310 are met. (Emphasis added.)

For cases in which a State payment "ceiling" exists, section 322 of the PRM states:

> In some instances the State has an obligation to pay, but either does not pay anything *or pays only part of the deductible, or coinsurance because of a State payment "ceiling."* For example assume that a State pays a maximum of $42.50 per day for the SNF services and the provider's cost is $60.00 a day. The coinsurance is $32.50 a day so that Medicare pays $27.50 ($60.00 less $32.50). In this case, the State limits its payment towards the coinsurance to $15.00 ($42.50 less $27.50). *In these situations, any portion of the deductible or coinsurance that the State does not pay that remains unpaid by the patient, can be included as a bad debt under Medicare provided that the requirements of §312 are met.* (Emphasis added.)

Section 322 of the PRM concludes by explaining that:

> If neither the title XIX plan, nor State or local law requires the welfare agency to pay the deductible and coinsurance amounts, there is no requirement that the State be responsible for these amounts. *Therefore, any such amounts are includable in allowable bad debts provided that the requirements of §312, or if applicable, §310 are met.* (Emphasis added.)

The patient's Medicaid status at the time of service should be used to determine their eligibility for Medicaid to satisfy the requirement of Section 312 and to determine the

State's cost sharing liability. A patient's financial situation and Medicaid eligibility status may change over the course of a very short period of time. The State maintains the most accurate patient information to make the determination of a patient's Medicaid eligibility status at the time of service and, thus, determine its cost sharing liability for unpaid Medicare deductibles and coinsurance. Thus, CMS issued Joint Signature Memo (JSM-370) which restated Medicare's longstanding bad debt policy that:

> [I]n those instances where the state owes none or only a portion of the dual-eligible patient's deductible or co-pay, the unpaid liability for the bad debt is not reimbursable to the provider by Medicare until the provider bills the State, and the State refuses payment (with a State remittance advice). Even if the State Plan Amendment limits the liability to the Medicaid rate, by billing the state, a provider can verify the current dual-eligible status of the beneficiary and can determine whether or not the State is liable for any portion thereof.

In fulfilling the requirements of sections 312 and 322 of the PRM, Medicare requires a provider to bill the State and receive a remittance advice that documents the Medicaid status of the beneficiary at the time of service, and the State's liability for unpaid deductibles and coinsurance as determined and verified by the State.[2] Accordingly, Section 1102.3L of the PRM, Part II (Exhibit 5 to Form CMS-339) requires the submission of the following documentation:

1. Evidence that the patient is eligible for Medicaid, e.g., Medicaid card or I.D. number
2. Copies of bills for Medicare deductibles and coinsurance that were sent to the State Medicaid Agency.
3. Copies of the remittance advice from the State Medicaid Agency showing the amount of the provider's claim(s) for Medicare deductibles and coinsurance denied.

In this case, the Provider claimed $170,537 in Medicare bad debts of which $135,106 was disallowed by the Intermediary. The Intermediary reviewed the Provider's collection and

---

[2] The Secretary's "must bill" policy for dual-eligible beneficiaries has been upheld by the Ninth Circuit Federal Court in the decision of Community Hospital of the Monterey Peninsula v. Thompson, 323 F.3d 782 (9th Cir. 2003). In *Community Hospital*, the court, rendered its decision on a motion for Summary Judgment in favor of the Secretary, and found that the "must-bill" policy was a reasonable implementation of the reimbursement system and not inconsistent with the statute and regulations. *Id.*

bad debt write-off policies and found that the Provider applied the New Jersey Medicaid payment formula to determine the State's liability for any portion of the coinsurance due from patients who were dually eligible for both Medicare and Medicaid. The Provider billed the State only in those instances where it determined that a liability existed. Where the calculations determined no liability, the Provider considered the outstanding coinsurance amount uncollectible and claimed a Medicare bad debt in that amount. The Intermediary disputed the propriety of writing off those amounts without billing the State for each patient and receiving contemporaneous documentation of a payment or a denial.

After a review of the record and the applicable law and Medicare policy, the Administrator finds that the Provider failed to meet all the regulatory requirements and the Manual guidelines for reimbursement of the subject amounts as Medicare bad debts. The Administrator finds that the State Medicaid program provides for the payment of dual eligible beneficiaries' deductible and coinsurance amounts. Thus, in order to determine the State's liability and, likewise, the amount of coinsurance and deductible attributable to Medicare bad debt, the Provider is required to bill the State for these claims. The Administrator finds that, as the Provider did not bill the State for the claims at issue in this case, it has not demonstrated that it has meet the necessary criteria for Medicare payment of bad debts related to these claims.

The policy requiring a provider to bill the State, where the State is obligated either by statute or under the terms of its plan to pay all, *or any part of* the Medicare deductible or coinsurance amounts, is consistent with the general statutory and regulatory provisions relating specifically to the payment of bad debts and generally to the payment of Medicare reimbursement. As reflected in 42 CFR 413.80(d)(1), the costs of Medicare deductible and coinsurance amounts which remain unpaid may be included in allowable costs. In addition, paragraph (e) of that regulation requires, *inter alia,* a provider to establish that a reasonable collection effort was made and that the debt was actually uncollectible when claimed.

A fundamental requirement to demonstrate that an amount is, in fact, unpaid and uncollectible, is to bill the responsible party. Section 310 of the PRM generally requires a provider to issue a bill to the party responsible for the beneficiaries payment. Section 312 of the PRM, while allowing a provider to deem a dually eligible patient indigent and claim the associated debt, first requires that no other party, including the State Medicaid program is responsible for payment. Section 322 of the PRM addresses the circumstances of dually eligible patients where there is a State payment ceiling. That section states that the "amount that the State does not pay" may be reimbursed as a Medicare bad debt. This language plainly requires that the provider bill the State as a prerequisite of payment of the claim by Medicare as a bad debt. Reading the sections together, the Administrator concludes that, in

situations where a State is liable for all or a portion of the deductible and coinsurance amounts, the State is the responsible party and is to be billed in order to establish the amount of bad debts owed under Medicare.

The above policy has been consistently articulated in the final decisions of the Secretary addressing this issue.[3] The final decisions of the Secretary have consistently held that the bad debt regulation and 42 CFR §413.20 require providers to bill the Medicaid programs for payment.[4] These decisions have denied payment when there is no documentation that actual collection efforts were made to obtain payments from the Medicaid authority before an account is considered uncollectible and when the provider did not even attempt to bill the State for its Medicaid patients.

Moreover, the must-bill policy concerning dual-eligible beneficiaries continues to be critical because individual States administer their Medical Assistance programs differently and maintain billing and documentation requirements unique to each State program. For instance, an eligibility category known as a qualified Medicare beneficiary (QMB) which was enacted by the Medicare Catastrophic Act of 1988 represents individuals who meet the definition in Section 1905(p)(1) of the Social Security Act for Medicaid. All QMBs are Medicare beneficiaries, entitled to the full range of Medicare-covered services and Medicare provider options, without regard to whether those services are covered under the Medicaid State Plan, and are eligible for Medicaid payment of their Medicaid cost-sharing expenses.

Section 1905(p)(3) of the Act imposes liability for cost-sharing amounts for QMBs on the States, though Section 1902(n)(2) allows States to limit that amount to the Medicaid rate and essentially pay nothing toward dual eligibles' cost-sharing if the Medicaid rate is lower than what Medicare would pay for the service. However, in most cases the State will always be liable to pay for a beneficiary's unpaid deductible amounts. The State maintains the most current and accurate information to determine if the beneficiary is a QMB, at the time of service, and the State's liability for any unpaid QMB deductible and coinsurance amounts through the State's issuance of a remittance advice after being billed by the provider.

Consistent with the statute, regulation and PRM, a provider must bill the State and the State process the bills or claims to produce a remittance advice for each beneficiary to determine their Medicaid status, at the time of service and the State's liability for unpaid Medicare deductible and coinsurance amounts. Thus, it is unacceptable for a provider to write-off a Medicare bad debt as worthless without first billing the State. Even in cases where the

---

[3] *See, e.g.,* California Hospitals Crossover Bad Debts Group Appeal PRRB Dec. No. 2000-D80; *See also* California Hospitals at n.16 (listing cases).
[4] *Id.*

provider has calculated that the State has no liability for outstanding deductible and coinsurance amounts, the provider must bill the State and receive a remittance advice before claiming a bad debt as worthless because, as stated above, the State has the most current and accurate information to make a determination.[5]

In light of the foregoing, the Administrator finds that the Board's decision is incorrect. The bad debts claimed by the Provider were not worthless when written off as Medicare bad debts on the FYE December 31, 2004 cost report. The Provider did not bill the State and receive a remittance advice to meet the reasonable collection effort requirements of the regulation and manual provisions for the claims at issue in this case. Accordingly, the Board's decision is reversed.

---

[5] In addition to verifying the validity of the provider's bad debt, submission of the claim to the State and preservation of the remittance advice is essentially a required record keeping criteria for Medicare reimbursement. Under Section 1815 of the Act, no Medicare payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider. Consistent with the statute, the regulations require that providers maintain verifiable and supporting documents to justify their requests for payment under Medicare. The regulation at 42 CFR 413.20 provides that:

> The principles of cost reimbursement require that providers maintain sufficient financial records and statistical data for provider determination of costs payable under the program.... Essentially the methods of determining costs payable under Medicare involve making use of data available from the institution's basis accounts, as usually maintained....

As used in the context of the regulation at §413.20, "maintain" means that the provider is required to keep records and data throughout the cost year and to then make available those records to the intermediary in order to settle the cost report in the normal course of business. The provider's failure to submit claims to the State, receive and "maintain" the required remittance advices, and furnish such documents to the Intermediary violates this principle.

## DECISION

In accordance with the foregoing opinion, the decision of the Board is reversed.

**THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES**

Date: 12/20/07

Herb B. Kuhn
Deputy Administrator
Centers for Medicare & Medicaid Services

Westlaw.

323 F.3d 782                                                                                           Page 1
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
**(Cite as: 323 F.3d 782)**

▷
Community Hosp. of Monterey Peninsula v.
Thompson
C.A.9 (Cal.),2003.

United States Court of Appeals,Ninth Circuit.
COMMUNITY HOSPITAL OF THE MONTEREY
PENINSULA; Alameda Hospital; Antelope Valley
Medical Center; California Hospital Medical Cen-
ter; California Pacific Medical Center; Cedars-Sinai
Medical Center; Chinese Hospital; Corcoran Dis-
trict Hospital; Clovis Community Hospital; Colusa
Community Hospital; Daniel Freeman Memorial
Hospitals; Daniel Freeman Marina Hospital; Davies
Medical Center; Eden Hospital Medical Center;
Fallbrook Hospital District; Fresno Community
Hospital; Glenn General Hospital; Henry Mayo Ne-
wall Memorial Hospital; Hospital of the Good
Samaritan-Los Angeles; Huntington Memorial Hos-
pital; Inter Community Medical Center; John Muir
Medical Center; Kern County Medical Center;
Laurel Grove Hospital; Loma Linda University
Hospital; Marshall Hospital; Merrithew Memorial
Hospital Medical Center; Pacific Coast Hospital;
Pomerado Hospital; Presbyterian Intercommunity
Hospital; Providence St. Joseph Medical Center-
Burbank; Riverside Community Hospital; San Joa-
quin General Hospital; San Luis Obispo County
General Hospital; San Mateo County General Hos-
pital; Santa Marta Hospital; Sharp Coronado Hos-
pital; Sharp Memorial Hospital; Sierra Community
Hospital Siskiyou General Hospital/Fairchild Med-
ical Center; St. John Regional Medical Center; St.
Luke's Hospital; Summit Medical Center; Sutter
Tracy Community Hospital; Tahoe Forest Hospital;
Tri-City Medical Center; Tulare District Hospital;
Tuolumne General Hospital; University of Califor-
nia Irvine Medical Center; University of California
at San Francisco Medical Center; University of
California San Francisco-Mount Zion; Valley Me-
morial Hospital; Valleycare Medical Hospital;
Woodland Memorial Hospital; Palomar Medical
Center, Plaintiffs-Appellees-Cross-Appellants,
v.
Tommy G. THOMPSON, Secretary of Health and

Human Services, Defendant-Appel-
lant-Cross-Appellee.
**Nos. 01-17512, 02-15115.**

Argued and Submitted Nov. 4, 2002.
Filed March 18, 2003.

Medicaid providers brought suit challenging Medi-
care policy concerning documentation necessary to
be reimbursed for bad debts related to services
provided to beneficiaries eligible for both Medicare
and Medi-Cal, California's state Medicaid program.
The United States District Court for the Northern
District of California, 2001 WL 1256890,Vaughn
R. Walker, J., granted summary judgment for pro-
viders, and Secretary of Health and Human Ser-
vices appealed. The Court of Appeals, Stapleton,
Circuit Judge, held that requirement that Medicare
providers subject to Medi-Cal's payment ceiling
submit evidence that they had billed Medi-Cal for
coinsurance and deductible obligations and re-
ceived refusal to pay, before bad debt could be re-
imbursed, was reasonable implementation of reim-
bursement system and consistent with governing
statute and regulations.

Reversed and remanded with instructions.
West Headnotes
[1] Health 198H ⚏535(4)

198H Health
    198HIII Government Assistance
        198HIII(C) Federal Medical Assistance to
the Elderly (Medicare)
            198Hk532 Providers
                198Hk535 Reimbursement
                    198Hk535(4) k. Costs Incurred.
Most Cited Cases
Cost shifting, prohibited by Medicare statute and
regulations, generally occurs where: (1) necessary
costs of delivering health care to Medicare en-
rollees are borne by individuals who are not Medi-
care recipients, or (2) necessary costs of delivering
health care to hospital's other patients not covered
by Medicare are borne by Medicare. Social Security

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                    Page 2
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
(Cite as: 323 F.3d 782)

Act, § 1861(v)(1)(A), as amended, 42 U.S.C.A. § 1395x(v)(1)(A); 42 C.F.R. § 413.80(d).

**[2] Statutes 361 ⇒219(2)**

361 Statutes
   361VI Construction and Operation
     361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
       361k219 Executive Construction
        361k219(2) k. Existence of Ambiguity. Most Cited Cases
Deference to agency's interpretation of statute is not appropriate if Congress has directly spoken to precise question at issue.

**[3] Health 198H ⇒557(2)**

198H Health
   198HIII Government Assistance
     198HIII(C) Federal Medical Assistance to the Elderly (Medicare)
      198Hk554 Judicial Review; Actions
       198Hk557 Scope of Review
        198Hk557(2) k. Deference to Agency in General. Most Cited Cases
If Secretary of Health and Human Services fills gap in Medicare statute that he is authorized to fill, his resolution is controlling on review of formal adjudication, unless arbitrary, capricious, or manifestly contrary to statute. Social Security Act, § 1801 et seq., as amended, 42 U.S.C.A. § 1395 et seq.

**[4] Health 198H ⇒523**

198H Health
   198HIII Government Assistance
     198HIII(C) Federal Medical Assistance to the Elderly (Medicare)
      198Hk521 Rules and Regulations in General
       198Hk523 k. Manuals and Handbooks. Most Cited Cases

**Health 198H ⇒557(2)**

198H Health
   198HIII Government Assistance

198HIII(C) Federal Medical Assistance to the Elderly (Medicare)
     198Hk554 Judicial Review; Actions
      198Hk557 Scope of Review
       198Hk557(2) k. Deference to Agency in General. Most Cited Cases
Pronouncements in manuals like Provider Reimbursement Manual (PRM), which do not have force of law, are entitled to less deference than interpretation arrived at after formal adjudication or notice-and-comment rulemaking.

**[5] Administrative Law and Procedure 15A ⇒413**

15A Administrative Law and Procedure
   15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
     15AIV(C) Rules and Regulations
      15Ak412 Construction
       15Ak413 k. Administrative Construction. Most Cited Cases
Although agency's interpretation of its own regulation is usually given substantial deference, agency interpretation of relevant provision which conflicts with agency's earlier interpretation is entitled to considerably less deference than consistently held agency view.

**[6] Health 198H ⇒535(4)**

198H Health
   198HIII Government Assistance
     198HIII(C) Federal Medical Assistance to the Elderly (Medicare)
      198Hk532 Providers
       198Hk535 Reimbursement
        198Hk535(4) k. Costs Incurred. Most Cited Cases
Requirement that Medicare providers subject to payment ceiling of California's state Medicaid program (Medi-Cal) submit evidence that they had billed Medi-Cal for coinsurance and deductible obligations and received refusal to pay, before bad debt could be reimbursed, was reasonable implementation of reimbursement system and consistent with governing statute and regulations; Secretary of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                          Page 3
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
**(Cite as: 323 F.3d 782)**

Health and Human Services was not required to ac-
cept data produced by computer-based system de-
signed to establish whether, and to what extent,
Medi-Cal was liable for particular coinsurance or
deductible payments under applicable law. Social
Security Act, § 1815(a), as amended, 42 U.S.C.A. §
1395g(a); 42 C.F.R. § 413.80(d).

**[7] Health 198H ⚖═535(4)**

198H Health
    198HIII Government Assistance
        198HIII(C) Federal Medical Assistance to
the Elderly (Medicare)
           198Hk532 Providers
               198Hk535 Reimbursement
                  198Hk535(4) k. Costs Incurred.
Most Cited Cases
To extent provision of Provider Reimbursement
Manual (PRM) was read to authorize reimburse-
ment of Medicare providers subject to payment
ceiling of California's state Medicaid program
(Medi-Cal) without evidence that they had billed
Medi-Cal for coinsurance and deductible obliga-
tions and received refusal to pay, provision was in-
consistent with policy of Secretary of Health and
Human Services and could not be enforced. Social
Security Act, § 1815(a), as amended, 42 U.S.C.A. §
1395g(a); 42 C.F.R. § 413.80(d).

**[8] Health 198H ⚖═535(4)**

198H Health
    198HIII Government Assistance
        198HIII(C) Federal Medical Assistance to
the Elderly (Medicare)
           198Hk532 Providers
               198Hk535 Reimbursement
                  198Hk535(4) k. Costs Incurred.
Most Cited Cases
Requirement that Medicare providers subject to
payment ceiling of California's state Medicaid pro-
gram (Medi-Cal) submit evidence that they had
billed Medi-Cal for coinsurance and deductible ob-
ligations and received refusal to pay, before bad
debt could be reimbursed, did not improperly shift
any cost from Medicare to non-Medicare patients.

Social Security Act, §§ 1815(a), 1861(v)(1)(A), as
amended,    42    U.S.C.A.    §§    1395g(a),
1395x(v)(1)(A); 42 C.F.R. § 413.80(d).

*784 Suzanne K. Yurk (argued), David W. Shapiro,
Jocelyn Burton, San Francisco, CA, for the defend-
ant-appellant-cross-appellee.
Sanford E. Pitler (argued), Carol Sue Janes, Vickie
Joseph Williams, Seattle, WA; Donald W. Carlson,
San Francisco, CA, for the plaintiffs-ap-
pellees-cross-appellants.

Appeal from the United States District Court for the
Northern District of California; Vaughn R. Walker,
District Judge, Presiding. D.C. No. CV-01-00142.

*785 Before STAPLETON,[FN*] O'SCANNLAIN,
and FERNANDEZ, Circuit Judges.

        FN* The Honorable Walter K. Stapleton,
        Senior United States Circuit Judge for the
        Third Circuit, sitting by designation.

**OPINION**
STAPLETON, Circuit Judge.

    *I. Overview*

Appellant, Tommy Thompson, Secretary of the De-
partment of Health and Human Services ("the Sec-
retary"), challenges the district court's grant of
summary judgment to the plaintiff hospitals ("the
Providers"). At issue is the Secretary's obligation to
reimburse the Providers for bad debts arising from
the failure of Medicare Part B participants to make
coinsurance and deductible payments under circum-
stances in which Medi-Cal, California's state Medi-
caid program, may be responsible for such pay-
ments.

Section 1395g(a) of Title 42 of the United States
Code provides in part that "no [reimbursement]
payments shall be made to any provider unless it
has furnished such information as the Secretary
may request in order to determine the amounts due
such provider...."42 U.S.C. § 1395g(a) (2002). Ex-
ercising this authority, the Secretary, throughout the
relevant period, consistently required the Providers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                    Page 4
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
**(Cite as: 323 F.3d 782)**

to submit evidence that they had billed Medi-Cal for coinsurance and deductible obligations and received a refusal to pay, known as a Remittance Advice or "R.A." The Providers found this "must bill" policy onerous for a number of reasons and undertook to develop a computer-based system intended to establish whether, and to what extent, Medi-Cal was liable for particular coinsurance or deductible payments under the applicable law. After the system was designed, the Providers asked if the Secretary would be willing to accept the data that the system would produce in lieu of evidence that Medi-Cal had refused to pay when billed. The Secretary declined to accept this tender, reaffirming the must-bill policy.

Because we find the must-bill policy to be a reasonable implementation of the reimbursement system and not inconsistent with the statute and regulations governing fiscal years 1989 through 1995 (the "relevant period"), we will reverse the summary judgment entered by the district court in favor of the Providers and remand with instructions that summary judgment be entered in favor of the Secretary.

## II The Medicare System

### A. Medicare, generally

Medicare pays for covered medical care provided to eligible aged and disabled persons. 42 U.S.C. §§ 1395-1395ggg (2002). The Centers for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA"), is the component of the Department of Health and Human Services that administers the Medicare program for the Secretary. CMS is headed by the Administrator, who acts on behalf of the Secretary in administrating the Medicare program.

Medicare is divided into two parts. Part A authorizes payments primarily for institutional care, including hospital inpatient services and skilled nursing facilities. 42 U.S.C. §§ 1395c-1395i-4. Generally, everyone who is eligible for Social Security benefits is also eligible for Part A benefits.

Part B pays for physicians' services, outpatient hospital services, and durable medical equipment. 42 U.S.C. §§ 1395j-*786 1395w-4. Part B resembles a private insurance policy. Individuals elect to be covered by Part B. They pay premiums as well as coinsurance and deductibles. 42 U.S.C. §§ 1395j, 1395l, 1395r, 1395s. Reimbursement for outpatient hospital services provided to Part B enrollees is handled by private insurance companies, who serve as fiscal intermediaries ("Intermediaries") for the Medicare program. *See* 42 U.S.C. § 1395u.

### B. Cost Shifting

[1] The Medicare statute and regulations prohibit cost shifting. *See* 42 U.S.C. § 1395x(v)(1)(A) (2002); 42 C.F.R. § 413.80(d) (2002). Generally, cost shifting occurs in the following two ways: (1) the necessary costs of delivering health care to Medicare enrollees are borne by individuals who are not Medicare recipients,[FN1] or (2) the necessary costs of delivering health care to the hospital's other patients not covered by Medicare are borne by Medicare.[FN2] *See* 42 U.S.C. § 1395x(v)(1)(A) (stating that "the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs").

> FN1. For example, when Medicare covers only 80 percent of a procedure's cost, the hospital's other patients would have to pay for the 20 percent loss through higher medical bills.

> FN2. For example, a hospital may raise the price charged for services provided to Medicare recipients to subsidize losses from other patient's unpaid bills.

Part B enrollees are responsible for paying coinsurance and deductible amounts. Because the coinsurance and deductible amounts are sometimes uncollectible from the enrollee, Medicare reimburses the health care provider for this "bad debt" to prevent a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                           Page 5
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
(Cite as: 323 F.3d 782)

cost shift from the Medicare recipient to individuals not covered by Medicare. *See* 42 C.F.R. § 413.80(d).

### C. Crossover patients from state Medicaid programs

Medicaid is a federal-state program that enables states to provide necessary medical care to individuals whose resources are inadequate to pay for such care. *See* 42 U.S.C. §§ 1396-1396v. State Medicaid agencies may enter into a buy-in agreement with the Secretary whereby the State enrolls the poorest Medicare beneficiaries, some of whom are also eligible for Medicaid, into the Part B program. These patients are often called "crossover patients." Generally, the state agrees to pay the premiums, coinsurance, and deductibles for the crossover patients as part of its Medicaid program.

### D. Medi-Cal crossover bad debts

Under 42 U.S.C. § 1396a(n), a state Medicaid program may impose a payment ceiling. The ceiling limits payment of the crossover patient's coinsurance and deductible to the difference between what the state would have paid for the service if the person had not been enrolled in Part B of Medicare and what Part B of Medicare actually did pay, up to the full amount of the coinsurance and deductible. Medi-Cal elected to impose such a ceiling in 1989.

For example, suppose the following facts: (1) a hospital incurs a cost of $100 in providing services to a crossover patient. (2) Medicare, under Part B, pays $80 of that cost. The amount representing the coinsurance and/or deductible usually paid by a noncrossover Part B enrollee is $20. If Medi-Cal determines that it would only pay $60 for the care provided to the crossover patient if the patient were not enrolled*787 in Part B, then it will pay none of the deductible/coinsurance (60-80 < 0, therefore Medi-Cal pays none of the $20 coinsurance/deductible). However, if Medi-Cal determines that it would have paid $90 of the covered service, then it will pay the provider $10 of the deductible/coinsurance (90-80=10, therefore Medi-Cal pays for $10 of the $20 coinsurance/deductible).

In these examples, the health care provider is shortchanged by $20 and $10 respectively. To prevent cost shifting, Medicare, through the Intermediary, reimburses the provider for the amount over the Medi-Cal cost ceiling as a bad debt.

California's application of its payment ceiling to outpatient hospital services required each provider to prepare a detailed bill for Medi-Cal so that Medi-Cal could price the services as if it were the primary payer and compare that price to what Medicare had already paid. Medi-Cal would pay only the difference. The bill had to be hand-coded because Medi-Cal's electronic billing system was not compatible with Medicare's.

Shortly after Medi-Cal imposed the payment ceiling, the Providers asked the Intermediaries if they were required to bill Medi-Cal for amounts above the payment ceiling. Medi-Cal and the Intermediaries instructed the Providers that they were required to bill Medi-Cal and receive a formal denial from it in order to be reimbursed by Medicare for the bad debt.

Many providers elected not to bill Medi-Cal at all, or to bill Medi-Cal on only some claims because they determined that billing was too costly when compared to the money Medi-Cal would ultimately pay pursuant to the payment ceiling. Because the Providers did not bill Medi-Cal, they were denied Medicare reimbursement for the unbilled bad debts caused by Medi-Cal's payment ceiling.

The Providers, hoping to find an alternative to billing Medi-Cal, enlisted Carlson, Price, Fass and Company ("Carlson Price") to help them create a database of unbilled crossover bad debt. The Providers also secured a limited amount of help from the California Department of Health Services ("CDHS"). CDHS asked EDS, a private company that processes the Medi-Cal claims for the state of California, to assist Carlson Price in developing a list of unbilled bad debt amounts. EDS agreed and contracted independently with Carlson Price to help produce the bad-debt data for crossover patients.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                      Page 6
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
(Cite as: 323 F.3d 782)

Using the Carlson Price system, the Providers' consultant ran sample cost reports. Because of the costliness of the process, the consultant wanted to be assured that the proposed surrogate data would be accepted. Instead of producing the documentation, the Providers submitted a proposal outlining the method EDS would use to identify the bad debts for each hospital's cost year from 1989 to 1995.[FN3] Accordingly, no documentation was submitted as part of the record to support *788 the claims, other than that of the sample reports. The documentation to support the claims has not yet been created by EDS for a majority of the 310 reimbursement years in question. The Intermediaries, citing the must-bill policy, rejected the data relating to unbilled claims.

> FN3. At the PRRB hearing, Allen Carlson testified to the following:
> Q [D]id you have EDS produce one of these reports for every-all 310 years in this group appeal?
> A No, we didn't
> Q Why not?
> A The-well, there's two reasons. One, we-we wanted to get the Intermediary's participation in the design of the report and make sure that this was acceptable to them They would not participate in that. They're expensive to produce, and until we know that they're going to be considered, it did not seem to be prudent on our part to incur the cost or-or the effort of-of everybody involved in order to produce all this documentation, but we're certainly prepared to produce that for every one of these cases.

### III. The Prior Proceedings

#### A. The PRRB decision

The Providers appealed the Intermediaries' decision to the Provider Reimbursement Review Board-the body charged with the initial appeal of an Intermediary's decision under Medicare. See 42 U.S.C. § 139500(a).

The PRRB based its decision on the provisions of the Provider Reimbursement Manual ("PRM"),

which contains interpretive rules reflecting CMS's construction of its own regulations and statutes. *California Hosp. 90-91 Outpatient Crossover Bad Debts Group v. Blue Cross of California*, PRRB 2000-D80, 2000 WL 1460668 (Sept. 6, 2000). The PRRB held that the PRM allowed providers of services that are subject to the Medi-Cal payment ceiling to recover the unpaid deductibles and coinsurance amounts as bad debts, so long as the indigence of the patient had been established.[FN4] With respect to crossover patients, the Board concluded that indigence of the patient was established by their being Medicaid eligible. The PRRB also concluded that the Carlson-Price data had "at a minimum, the same basic information as on a Medi-Cal remittance advice." *Id.* at *17.

> FN4. 42 C.F.R. § 405.186 requires the PRRB to "afford great weight to interpretive rules" such as the PRM.

#### B. The Administrator's decision

The Administrator, acting on behalf of the Secretary, reversed the PRRB's decision, sustaining the Secretary's right to insist upon Medi-Cal being billed. *California Hosp. 90-91 Outpatient Crossover Bad Debts Group v. Blue Cross of California*, 2000 WL 33170706 (Oct. 31, 2000). The Administrator acknowledged that the PRM allowed a provider to deem patients qualifying for Medicaid indigent, but he held that the regulations required reasonable collection efforts before a bad debt was reimbursable. In the crossover-bad-debt context, the Administrator concluded that a reasonable collection effort under the regulations included establishing whether, and if so how much, Medi-Cal would pay.

The Administrator also held that the regulations require "the provider ... to keep records and diaries throughout the cost year and to then make available those records to the intermediary in order to settle the cost report in the normal course of business." *Id.* at *10. The Administrator concluded that by failing to bill Medi-Cal, "the providers did not maintain contemporaneous documentation in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                          Page 7
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
**(Cite as: 323 F.3d 782)**

ordinary course of business to support their
claims." *Id.*

### C  The district court's decision

The Providers sought judicial review of the Admin-
istrator's decision and the district court overturned
that decision. *Cmty. Hosp. v. Thompson,* No. C-
01-0142, 2001 WL 1256890, 2001 U.S. Dist. LEX-
IS 16938 (N.D.Cal. Oct. 16, 2001) In the course of
granting summary judgment for the Providers, the
district court held that nothing in the statute, regula-
tions, or the PRM required the must-bill policy and
that the Secretary was seeking "to impose addition-
al unstated and unwritten requirements,"**789**
which they did not support. *Id.* at *14-15. The court
also concluded that the must-bill requirement was
expressly disavowed by one provision of the PRM,
PRM-II § 1102.3L, which states that "it may not be
necessary for a provider to actually bill the Medi-
caid program to establish a Medicare crossover bad
debt where the provider can establish that Medicaid
is not responsible for payment." *Id.* at *13.

The court further held that the must-bill policy viol-
ated the cost-shifting prohibitions of the statute and
regulations, noting that the "must bill requirement
causes some bad debt to go unrecovered and some
billing procedures that cost more than they recover.
These lost costs [, the court concluded,] must be re-
distributed somewhere." *Id.* at *16.

Finally, the court found that the Carlson-Price sys-
tem was capable of "determin[ing] the amount that
Medi-Cal will not pay pursuant to the its [sic] pay-
ment ceiling, without having to go through the of-
ten prohibitively burdensome process of hand
billing Medi-Cal." *Id.* at *16. Therefore, the court
reversed the Administrator's decision and remanded
the matter to the Secretary with directions to accept
the Carlson-Price data.[FN5]

> FN5  The district court decision remanded
> the matter to the Secretary to determine
> whether the PRRB properly exercised jur-
> isdiction over some of the Providers. In his
> brief, and at oral argument, the Secretary
> conceded this jurisdictional issue. As a res-

ult of this concession by the Secretary, the
Providers' cross-appeal has been rendered
moot and will not be addressed.

### IV. *Jurisdiction and Standards of Review*

#### A. Jurisdiction

The Administrator's reversal of the PRRB was a fi-
nal decision by the Secretary, reviewable by the
district court under 42 U.S.C. § 1395oo(f)(1). We
review the district court's grant of summary judg-
ment under 28 U.S.C. § 1291.

#### B. Standard of review, generally

The district court's review of the Administrator's
decision, and our *de novo* review of its decision, are
governed by the Administrative Procedure Act, 5
U.S.C. §§ 701-706, which provides that the
agency's decision will be set aside only if it is
"arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law ... or unsup-
ported by substantial evidence." 5 U.S.C. §
706(2)(A), (E). *See also French Hosp. Med. Ctr. v.
Shalala,* 89 F.3d 1411, 1416 (9th Cir.1996).

#### C. Deference

[2] Deference to an agency's interpretation of a stat-
ute is not appropriate if "Congress has directly
spoken to the precise question at issue." *Chevron
U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467
U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694
(1984). "If the intent of Congress is clear, that is
the end of the matter; for the court, as well as the
agency, must give effect to the unambiguously ex-
pressed intent of Congress." *Id.* at 842-43, 104
S.Ct. 2778.

Neither side maintains that Congress has "directly
addressed the precise question at issue" here. On
the contrary, it is clear from the text of the Medi-
care Act that Congress expected the Secretary to re-
solve this and similar issues

The Medicare statute gives the Secretary broad dis-
cretion to determine what "reasonable cost[s]" of
services to Medicare beneficiaries may be reim-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bursed to "providers of services." *See* 42 U.S.C. § 1395x(v)(1)(A) (stating that reasonable costs "shall be determined in accordance *790 with regulations establishing the method or methods to be used, and the items to be included"). And, as we have noted, it also specifically granted the Secretary broad discretion as to what information to require as a condition of payment to providers under the Medicare program. 42 U.S.C. § 1395g(a). Since "Congress has explicitly left [this] gap for the agency to fill," any regulation regarding the issue must be "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778.

[3] It is not necessary, however, that the Secretary provide resolution of such an issue by promulgating regulations. As the Supreme Court concluded in *Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995):

[There is no] basis for suggesting that the Secretary has a statutory duty to promulgate regulations that, either by default rule or by specification, address every conceivable question in the process of determining equitable reimbursement. To the extent the Medicare statute's broad delegation of authority imposes a rulemaking obligation, it is one the Secretary has without doubt discharged. The Secretary has issued regulations to address a wide range of reimbursement questions. The regulations are comprehensive and intricate in detail, addressing matters such as limits on cost reimbursement, apportioning costs to Medicare services, and the specific treatment of numerous particular costs.

. . .

As to particular reimbursement details not addressed by her regulations, the Secretary relies upon an elaborate adjudicative structure which includes the right to review by the Provider Reimbursement Review Board, and, in some instances, the Secretary, as well as judicial review in federal district court of final agency action. That her regulations do not resolve the specific timing question before us in a conclusive way, ... does not, of course, render them invalid, for the "methods for the estimation of reasonable costs" required by the statute only need be "generalizations [that] neces-

sarily will fail to yield exact numbers." The APA does not require that all specific applications of a rule evolve by further, more precise rules rather than by adjudication. The Secretary's mode of determining benefits by both rulemaking and adjudication is, in our view, a proper exercise of her statutory mandate.[FN6]

> FN6. The "timing" issue in *Guernsey* was whether the provider was entitled to total reimbursement of a defeasance loss arising from a refinancing in the year of the refinancing, as it claimed, or whether the Secretary could require that the loss be amortized and reimbursed over the life of the old bonds.

*Id.* at 96–97, 115 S.Ct. 1232 (citations omitted). It is, thus, well settled that, if the Secretary fills a gap that he is authorized to fill, his resolution in the course of formal adjudication of the kind we review is controlling unless arbitrary, capricious, or manifestly contrary to the statute.[FN7]

> FN7. The Providers rely heavily on *Shalala v. St. Paul-Ramsey Med. Ctr.,* 50 F.3d 522 (8th Cir.1995), for the proposition that the Secretary cannot "impose additional unstated and unwritten requirements" not found in his regulations or policy manual. *Id.* at 528. At issue was Section 312(A) of PRM-I, which provided that "the patient's indigence must be determined by the provider, not by the patient." The Secretary had denied the requested reimbursement for bad-debt loss because the provider had ascertained the indigency of its patients based on information supplied by the patients, which it had not independently verified. *St. Paul-Ramsey,* 50 F.3d at 524. Expressly assuming *arguendo* that § 312(A) had the force and effect of a regulation, the court directed reimbursement, reasoning as follows:
>
> On the basis of the information that the patients *supply,* it is undisputed that only

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                                    Page 9
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
(Cite as: 323 F.3d 782)

Ramsey itself determines whether that information satisfies the indigency requirements. Here, the Secretary seeks to impose additional unstated and unwritten requirements pertaining to the nature and quality, i.e., verification, of the information used for the indigency determination-not who ultimately makes the determination. Section 312(A) is absolutely silent on that issue and it does not support an interpretation which imposes an additional implied verification requirement.

*Id.* at 528 (emphasis in original). The *St. Paul-Ramsey* court thus found it unreasonable for the Secretary to find an independent verification requirement implicit in the requirement that the provider determine indigency. *Id.* at 529.

While we conclude, hereafter, that it was reasonable for the Secretary to find a billing requirement implicit in the relevant regulations and policy manuals, and consider *St. Paul-Ramsey* distinguishable on that basis, our conclusion would be the same even if we did not hold this view. As we understand the teachings of the Supreme Court in *Guernsey,* the Secretary may enforce a requirement that is consistent with, and a reasonable implementation of, his regulations and manuals without being able to point to a regulation or manual provision that directly, or by implication, imposes an affirmative duty to comply with that requirement.

*791 [4] Pronouncements in manuals like the PRM, which do not have the force of law, are entitled to less deference than an interpretation arrived at after a formal adjudication or notice-and-comment rulemaking. *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). As the Supreme Court explained in *Christensen,*

[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law-do not warrant *Chevron*-style deference. See, *e.g., Reno v. Koray,* 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46

(1995) (internal agency guideline, which is not "subject to the rigors of the Administrative Procedur[e] Act, including public notice and comment," entitled only to "some deference" (internal quotation marks omitted)); *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 256-258, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (interpretative guidelines do not receive *Chevron* deference); *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (interpretative rules and enforcement guidelines are "not entitled to the same deference as norms that derive from the exercise of the Secretary's delegated lawmaking powers"). See generally 1 K. Davis & R. Pierce, Administrative Law Treatise § 3.5 (3d ed.1994). Instead, interpretations contained in formats such as opinion letters are "entitled to respect" under our decision in *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but only to the extent that those interpretations have the "power to persuade," *ibid.*

*Id.* Thus, as the Supreme Court noted in *Guernsey,* 514 U.S. at 99, 115 S.Ct. 1232, "[i]nterpretive rules [found in the PRM] do not have the force and effect of law and are not accorded that[*Chevron* ] weight in the adjudicatory process."

The deference to which such interpretive rules are entitled was described in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), as follows:

We consider that the ... interpretations ... of the Administrator ..., while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such *792 a judgment ... will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.* at 140, 65 S.Ct. 161. *See United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
(Cite as: 323 F.3d 782)

[5] Although an agency's interpretation of its own regulation is usually given substantial deference, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)). *See also Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 515, 114 S.Ct 2381, 129 L.Ed.2d 405 (1994).

### V. *The Governing Law During the Relevant Period*

#### A. The statute

As previously noted, the Medicare statute authorizes the Secretary to reimburse "both direct and indirect costs of providers of services" and to promulgate regulations stipulating how that will be done. 42 U.S.C. § 1395x(v)(1)(A); 42 U.S.C. § 1395g(a).

#### B. The regulations

[6] Utilizing this statutory authority, the Secretary has promulgated regulations setting forth the criteria for allowable bad debt and the kind of documentation that must be submitted to establish that those criteria have been met. Section 413.80(e) of Title 42 of the Code of Federal Regulations provides as follows:

(e) *Criteria for allowable bad debt.* A bad debt must meet the following criteria to be allowable:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) The provider must be able to establish that reasonable collection efforts were made

(3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

Section 413.20(a) provides:

(a) *General* The principles of cost reimbursement require that providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program. Standardized definitions, accounting, statistics, and reporting practices that are widely accepted in the hospital and related fields are followed. Changes in these practices and systems will not be required in order to determine costs payable under the principles of reimbursement. Essentially the methods of determining costs payable under Medicare involve making use of data available from the institution's basi[c] accounts, as usually maintained, to arrive at equitable and proper payment for services to beneficiaries.

The Secretary, speaking through the Administrator, found that the must-bill policy is a "fundamental requirement to demonstrate," as required by § 413.80(e) in the crossover-bad-debt context, that "reasonable collection efforts [have been] made" and that "the debt was actually uncollectible when claimed [as worthless]." *California Hosp.,* 2000 WL 33170706, at *8. He further found that "the fact that a State implements a payment ceiling does **\*793** not relieve a provider from billing in order to contemporaneously establish an amount that is unpaid and uncollectible...."*Id.* Finally, the Secretary concluded that the must-bill policy was necessary in order to generate contemporaneous documentation that could be "maintained" in the usual course of the provider's business as required by § 413.20(a). We find this to be a reasonable reading of these regulations.

It may be true, as the Providers insist, that these regulations can be read as not precluding the possibility of a provider's establishing the criteria of § 413.80(e) by alternative means that would also generate contemporary records to be maintained in the usual course of its business. This would not, however, justify our refusing to accept the Secretary's insistence on billing Medi-Cal in this case.

First, as the Secretary specifically concluded with record support, "[r]egardless of whether surrogate documentation can be provided, in this case the Providers did not maintain contemporaneous documentation in the ordinary course of business to sup-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                    Page 11
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
(Cite as: 323 F.3d 782)

port their claims." *California Hosp.* 2000 WL 33170706, at *10. More fundamentally, however, it is not necessary for the Secretary to resolve all issues by regulation. *Guernsey,* 514 U.S. at 96, 115 S.Ct. 1232. The Secretary is authorized to determine what supporting documentation will be required. When he makes a determination through adjudication, we will defer to that interpretation if it is not inconsistent with the statute and regulations, and is a reasonable implementation thereof. Given that billing the state is the most straightforward and reliable way of determining whether, and, if so, how much the state will pay, we are unable to say that the must-bill policy is inconsistent with the statute or regulations or is an unreasonable implementation of them.

C. The Provider Reimbursement Manual Part I

During the relevant period, §§ 310, 312, and 322 of the PRM Part I provided additional advice with respect to bad-debt reimbursement. Section 310 provided in relevant part:

To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients. It must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations. It also includes other actions such as subsequent billings, collection letters and telephone calls or personal contacts with this party which constitute a genuine, rather than a token, collection effort. The provider's collection effort may include using or threatening to use court action to obtain payment. (See § 312 for indigent or medically indigent patients.)

                               * * *

B. Documentation Required.-The provider's collection effort should be documented in the patient's file by copies of the bill(s), follow-up letters, reports of telephone and personal contact, etc. Section 312 provided:

In some cases, the provider may have established before discharge, or within a reasonable time before the current admission, that the beneficiary is either indigent or medically indigent. Providers can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid as either categorically needy individuals or medically *794 needy individuals, respectively. Otherwise, the provider should apply its customary methods for determining the indigence of patients to the case of the Medicare beneficiary under the following guidelines:

A. The patient's indigence must be determined by the provider, not by the patient; i.e., a patient's signed declaration of his inability to pay his medical bills cannot be considered proof of indigency;

B. The provider should take into account a patient's total resources which would include, but are not limited to, an analysis of assets (only those convertible to cash, and unnecessary for the patient's daily living), liabilities, and income and expenses. In making this analysis the provider should take into account any extenuating circumstances that would affect the determination of the patient's indigence;

C. The provider must determine that no source other than the patient would be legally responsible for the patient's medical bill; e.g., title XIX, local welfare agency and guardian; and

D. The patient's file should contain documentation of the method by which indigence was determined in addition to all backup information to substantiate the determination.

Once indigence is determined and the provider concludes that there had been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible without applying the § 310 procedures. (See § 322 for bad debts under State Welfare Programs.)

Finally, Section 322, entitled "Medicare Bad Debts Under State Welfare Programs," provided in relevant part:

Where the State is obligated either by statute or under the terms of its plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare. Any portion of such deductible or coin-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                          Page 12
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
(Cite as: 323 F.3d 782)

surance amounts that the State is not obligated to pay can be included as a bad debt under Medicare, provided that the requirements of § 312 or, if applicable, § 310 are met.

In some instances, the State has an obligation to pay, but either does not pay anything or pays only part of the deductible or coinsurance because of a State payment "ceiling." For example, assume that a State pays a maximum of $42.50 per day for SNF services and the provider's cost is $60.00 a day. The coinsurance is $32.50 a day so that Medicare pays $27.50 ($60.00 less $32.50). In this case, the State limits its payment towards the coinsurance to $15.00 ($42.50 less $27.50). In these situations, any portion of the deductible or coinsurance that the State does not pay that remains unpaid by the patient, can be included as a bad debt under Medicare, provided that the requirements of § 312 are met.

As the Secretary reads these provisions, they (1) establish a general rule that "reasonable collection effort" within the meaning of the regulations involves billing anyone responsible for payment, (2) excuse billing indigent patients, and (3) provide that where a state may be liable for coinsurance and deductible debt not paid by the patient, whether or not there is a ceiling, bad debt can be reimbursed only if and to the extent that the state does not pay. These propositions, in the Secretary's view, necessarily imply that a potentially liable state must be billed. He finds this confirmed by the portion of § 322 stipulating that there may be a bad-debt claim only if the state "does not pay anything or pays only part ... because of a *795 State payment ceiling...." This requirement that the state not have satisfied the patient's debt is illusory, the Secretary maintains, if the regulations impose no duty to demand payment from the state.

The Providers read § 312 as providing an exception to the billing requirement of § 310, which, in the case of an indigent patient eligible for Medicaid, relieves the provider of the duty to bill not only the patient but also any potentially liable state. The Providers arrive at this conclusion because § 312 allows Medicaid patients to be deemed indigent and provides that "[o]nce indigence is determined ... the

debt may be deemed uncollectible without applying the § 310 procedures." PRM § 312.

Once again, we are unable to say that the Secretary's interpretation is unreasonable. Non-Medicaid patients are not deemed indigent. When a patient is not deemed indigent, the provider must apply the requirements of § 312(A)-(D) to establish the patient's indigence. Section 312(C) requires that "the provider must determine that no other source other than the patient would be legally responsible for the patient's medical bill; e.g., title XIX, local welfare agency and guardian." Section 312(C), although literally inapplicable to Medicaid patients, evidences that the Secretary understandably remains interested in alternative sources of payment when the patient, himself, is unable to pay for the service. It is difficult to understand why anyone responsible for the reimbursement program would insist on a provider pursuing those secondarily liable in cases where the patient is "determined" to be indigent, and not so insisting where the patient is "deemed" to be indigent because he or she qualifies for Medicaid. This fact supports the Secretary's view that § 312 excuses only billing the indigent patient and that the subject of billing states with welfare programs is covered by § 322, as evidenced by the parenthetical that concludes § 312-"(See § 322 for bad debts under State Welfare Programs.)".*See GCI Health Care Ctrs., Inc. v. Thompson,* 209 F.Supp.2d 63, 71 (D.D.C.2002) ("The reasoning behind PRM § 312 prevents a provider from undertaking collection efforts when such efforts would be largely futile due to a patient's indigence.... This reasoning does not apply when a state is the responsible payor under a state Medicaid plan.")

The first quoted paragraph of § 322 declares that to the extent a state is responsible for Medicare deductible or coinsurance amounts, those amounts may not be claimed as bad debt. Conversely, it establishes that to the extent a state is not responsible for such amounts, they may be claimed as bad debt if (a) the requirements of § 312 are met (i.e., the patient has been "deemed" or "determined" to be indigent and billing of the patient is excused), or (b) if applicable, the requirements of § 310 are met (i.e.,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                    Page 13
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
(Cite as: 323 F.3d 782)

reasonable efforts have been made to collect from the patient).

The second quoted paragraph makes clear that the same principles apply when there is a payment ceiling. As the Providers stress, however, this paragraph concludes with a reference to § 312 only, omitting any reference to § 310. To the Providers, this confirms their view that § 312 waives the billing requirement of § 310 for all potentially liable parties where the patient has been "deemed" to be indigent.

Given that the second quoted paragraph of § 322 appears to involve a subset of the cases covered by the first, the absence of a reference to § 310 is puzzling. The Providers' explanation for this is less than satisfying, however. Section 312 cannot be read to make a distinction between cases in which there is a state plan without a *796 ceiling and cases in which there is a state plan with a ceiling. Thus, if § 312 can be read to grant a billing exemption other than with respect to the patient, it is an exemption that extends to cases that come within the scope of the first as well as the second paragraph of § 322. Section 312, accordingly, does not explain the difference in phrasing in the first quoted paragraph of § 322 and the second. While it is true that the existence of a ceiling may make it predictable, in some cases, that no state payment will be forthcoming, in many cases, it will be unclear whether the state will pay, and, if so, how much. More importantly, the Providers have suggested no persuasive reason why the Secretary might have decided that billing the state was not necessary in ceiling cases, while necessary in other state welfare situations.

While the lack of parallel language in the last sentence of the second quoted paragraph of § 322 provides a basis for an argument that a difference in treatment was intended in ceiling cases, we do not think it provides a sufficient basis for concluding that the Secretary's interpretation of these provisions is unreasonable. Read together, the relevant provisions of PRM Part I indicate that the Secretary insists upon reasonable efforts to collect from states

that may be liable for deductibles and coinsurance. Those provisions, fairly read, require reasonable collection efforts, including billing, in indigency cases as well as non-indigency cases, and in ceiling cases as well as non-ceiling cases.

As with the regulations, the Providers contend that these provisions of PRM Part I do not rule out the possibility that one could comply with § 322 by establishing the extent of a state's obligation to pay by a means other than billing and awaiting the state's answer. While we agree with the Secretary that §§ 310, 312, and 322 are more reasonably read to require billing, our conclusion would be no different if we believed the Providers' reading were a permissible one. At most, these provisions are ambiguous, and we must defer to the Secretary's reasonable determination that billing is required, a determination which he has arrived at through formal adjudication.

### D. Adjudicative decisions

The foregoing constitute the only statutes, regulations, and manual instructions in existence during the relevant period (1989-1995). During that period, there is no evidence that the Secretary ever reimbursed crossover bad debt without an R.A. These Providers consistently asked for reimbursement without an R.A. and were consistently denied. Moreover, several PRRB cases decided prior to 1995 denied reimbursement pursuant to the must-bill policy. *See Hospital de Area de Carolina,* Admin. Dec. No. 93-D23, Apr. 26, 1993, Medicare & Medicaid Guide (CCH) ¶ 41,411 (reversing a PRRB decision and denying bad-debt reimbursement, in part because the Provider "never filed claims for reimbursement of unpaid deductibles and coinsurance amounts with [Puerto Rico's] Medicaid program"); *St. Joseph Hosp.,* PRRB Dec. No. 84-D109, Apr. 16, 1984, Medicare & Medicaid Guide (CCH) ¶ 34,096 (holding that collection efforts were not adequate when a provider failed to take action to collect amounts owed by the Georgia's Medicaid system).

Although the Providers argue that, on at least two

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                    Page 14
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
(Cite as: 323 F.3d 782)

occasions, the PRRB has deviated from the must-bill requirement, both cases were decided after the relevant period.[FN8] Moreover, in neither case did the *797 Secretary leave a decision standing that reimbursed bad-debts without a supporting R.A.

> FN8. The PRRB decision in *Santa Marta* was issued on December 5, 1996. The PRRB decision in *Communi-Care v. Pro Rehab, Inc. v. Blue Cross and Blue Shield Ass'n,* PRRB Dec. No. 97-D24, 1997 WL 256741 (Jan. 29, 1997), was issued on January 29, 1997, and the ensuing Administrator's decision was issued on March 31, 1997.

In *Santa Marta Hosp. v. Blue Cross and Blue Shield Ass'n,* PRRB Dec. No. 97-D16, 1996 WL 887646 (Dec. 5, 1996), the PRRB did conclude PRM § 322 as not requiring the billing of a state Medicaid program. *Id.* at *9 (stating that "the Board is persuaded by the Provider's argument that, in the face of Medi-Cal's instructions to the contrary, the Provider need not bill the Medi-Cal program for Medicare Part B deductible and coinsurance amounts in order for the Provider to sustain bad debt claims ..."). However, this case provides little support for the Providers' assertion that the Secretary has approved reimbursement in the absence of a billing of the state. The PRRB ultimately denied the bad-debt claim, and its decision was not appealed. While the Administrator could have reviewed the PRRB decision *sua sponte,* it had no occasion to do so given that reimbursement was denied.

In *Communi-Care Pro Rehab, Inc. v. Blue Cross and Blue Shield Ass'n,* 1997 WL 256612 (Mar. 31, 1997), a provider of physical therapy services to nursing home residents in Virginia sought reimbursement for bad debt, complaining that an amendment to Virginia's plan had barred *all* direct claims against the state by such providers and had relegated them to making claims on the nursing homes who would secure reimbursement through the nursing facility's per diem rates. The physical therapy provider asserted that this per diem, rate-sharing approach did not result in full payment for

his services because Virginia had placed ceilings on such per diem rates. It was in this context that the PRRB understandably said it was "unpersuaded by the contention that the Provider should have billed the state of Virginia in the face of Virginia's amendment eliminating direct reimbursement." PRRB Dec. No. 97-D24, 1997 WL 256741, at *11. On review, the Administrator held that Virginia's per diem ceilings were not the kind of "ceiling" referred to in 8 C.F.R. § 322, a holding that is unhelpful here. 1997 WL 256612. The Administrator further held that the physical therapy provider could not recover because the Secretary's must-bill requirement required that he submit a bill to the nursing home and have his demand rejected. *Id.*

The PRRB decisions before and during the relevant period are thus consistent with the Secretary's position.

### VI. *PRM Part II § 1102.3L, Column 4*

#### A. The provision

[7] Part II of the PRM ("PRM-II") was promulgated in November of 1995. PRM-II § 1102.3L states, in pertinent part, the following:
Evidence of the bad debt arising from Medicare/Medicaid crossovers may include a copy of the Medicaid remittance showing the crossover claim and resulting Medicaid payment or non-payment. However, it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt where the provider can establish that Medicaid is not responsible for payment. In lieu of billing the Medicaid program, the provider must furnish documentation of:
Medicaid eligibility at the time services were rendered (via valid Medicaid eligibility number), and
*798 Nonpayment that would have occurred if the crossover claim had actually been filed with Medicaid.
The payment calculation will be audited based on the state's Medicaid plan in effect on the date that services were furnished. Providers should be aware of any change in the Medicaid payment formula

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                                    Page 15
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
(Cite as: 323 F.3d 782)

that might impact the crossover calculation, and ensure that these changes are reflected in the claimed Medicare bad debt.

The Providers understandably point to this portion of PRM-II as establishing that crossover bad debt can be reimbursable without a supporting R.A. The Secretary insists, in response, that the authorization of an alternative to billing is irrelevant, here, because it applies only when patients are "categorically denied payment under the State's Medicaid program ..." Appellant's Brief at 42. As an example of such a "categorical denial of payment," the Secretary cites bad debt associated with the treatment of individuals aged 22-64 by institutions for the mentally ill. *Id.* at n. 14. The Medicaid statute and regulations categorically preclude payment for such services.

We conclude that the text of § 1102.3L is not subject to the interpretation that the Secretary seeks to give it. The references to the "payment calculation ... be[ing] audited based on the state's Medicaid plan in effect on the date" of the service and to changes in the "Medicaid payment formula" are simply incompatible with a reading that limits the authority given to cases of categorical exclusions. Accordingly, we agree with the Providers that the author of § 1102.3L thought it permissible "[i]n lieu of billing the Medicaid program, [for a] provider [to] furnish documentation of ... Medicaid eligibility ... and [the][n]on-payment that would have occurred if the crossover claim had actually been filed with Medicaid." Moreover, nothing suggests the author understood § 1102.3L to be establishing a change in policy.[FN9]

> FN9. Indeed, as the Providers stress, there is strong reason to believe that the author had no intent to change existing policy. Effective in August of 1987, Congress imposed a moratorium on changes in bad-debt-reimbursement policies, and the Secretary lacked authority in November of 1995 to effect a change in policy.

B. The legal effect of § 1102.3L

PRM-II § 1102.3L is thus inconsistent with the Secretary's must-bill policy, and we must decide what the legal significance of that inconsistency is. This is not a situation in which an administrative agency that has consistently interpreted a statute or regulation in one way asks the court to defer to a new and different interpretation. *See Cardoza-Fonseca,* 480 U.S. at 446 n. 30, 107 S.Ct. 1207; *Thomas Jefferson Univ.,* 512 U.S. at 515, 114 S.Ct. 2381. In situations of that kind, interested parties understandably will have relied on the agency's first reading. Here, the record demonstrates that the Secretary enforced the policy to which he asks us to defer throughout the relevant period, and there is no evidence of his having reimbursed crossover bad debt without evidence of billing.

The Providers consistently asked for reimbursement without evidence of billing throughout the relevant period, and reimbursement was consistently denied. Indeed, this was what led to their efforts to develop a surrogate data approach. Accordingly, the Providers cannot claim that their reliance interests have been unfairly frustrated. The only inconsistency to which the Providers can point is found in a manual provision that was not in existence during the relevant period, i.e., the cost *799 years concluding in 1989 through 1995 and that does not have the force of law.

As we have noted, the provisions of the PRM are entitled to less deference than regulations which do have such force, and the weight to be given it should "depend upon ... those factors which give it power to persuade, if lacking power to control." *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. While PRM-II § 1102.3L is surely relevant to our determination of the amount of deference to be given to the must-bill policy, we know nothing about the circumstances of its promulgation that would cause us to favor it over the consistently applied policy during the relevant period. Similarly, if read to authorize the Providers' surrogate data system, as they insist it does, we believe there is reason to favor the must-bill policy. Because a regulation has the force of law, an interpretation of a regulation in Part II of the PRM "that is inconsistent with [the] regulation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

323 F.3d 782                                                                                                    Page 16
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
**(Cite as: 323 F.3d 782)**

[should] not be enforced." *Nat'l Med. Enters. v. Bowen*, 851 F.2d 291, 293 (9th Cir.1988). We believe § 413.20(a) is most reasonably read, as the Secretary does, to require documentation reflecting "data available from the institution's basic accounts, as usually maintained." 42 C.F.R. § 413.20(a). Yet, as the Secretary found, "in this case, the Providers did not maintain contemporaneous documentation in the ordinary course of business to support their claim." Accordingly, to the extent PRM-II § 1102.3L is read to authorize reimbursement to the Providers in this case, it cannot be enforced.

### VII. *Cost Shifting*

As we have previously noted, the Medicare statute prohibits the shifting of the cost of providing healthcare for Medicare beneficiaries to other patients and vice-versa. More specifically, § 1395x(v)(1)(A) directs that the Secretary's regulations

shall (i) take into account both direct and indirect costs of providers of services ... in order that ... the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs. ...

42 U.S.C. § 1395x(v)(1)(A).

[8] The Providers insist that the Secretary's must-bill policy is in conflict with this directive, and the district court agreed. It reasoned as follows:
Defendants do not dispute that their must-bill requirement causes some bad debt to go unrecovered and some billing procedures that cost more than they recover. These lost costs must be redistributed somewhere. Plaintiffs have developed a method by which they can determine the amount that Medi-Cal will not pay pursuant to the [sic] its payment ceiling, without having to go through the often prohibitively burdensome process of hand billing Medi-Cal. To require billing under such circumstances is ... arbitrary and capricious as against Congress' prohibition on cost-shifting.

*Cmty. Hosp.*, 2001 U.S. Dist. LEXIS 16938 at *16.

We conclude that this record demonstrates no cost shifting of the kind Congress intended to foreclose.

Our review of the district court's analysis must begin with an identification of what "cost" it is that is allegedly being "shifted" from Medicare to non-Medicare patients. It is not the cost of bad debt. Under the Secretary's regulations, that cost will be paid either by California, to the extent it is below the ceiling in any *800 given case, or by the federal government, to the extent it is not. Thus, the burden of bad-debt loss will not fall on non-Medicare patients. Rather, the cost that the Providers insist is being shifted by the must-bill policy is the Providers' cost of billing Medi-Cal.

In order to be reimbursable under the Medicare statute, a cost must be a direct or indirect cost of providing covered services to covered individuals. The cost of billing is an indirect cost of providing the service for which the bill would be sent. As such, it is undoubtedly a cost that cannot be shifted. This record tells us nothing, however, about the Providers' billing cost and the extent to which they are reimbursed by the Secretary. The record speaks only to the reimbursement of bad debt. The Providers have tendered nothing tending to show that the cost of service reimbursement has not otherwise fairly compensated them for the direct and indirect cost of the services they provide, including the cost of billing. To the contrary, one would infer from the record and the statutory scheme that billing costs are otherwise reimbursed. If this were not so, a shift of cost to non-Medicare patients would occur whenever a coinsurance or deductible bill is sent to a Medicare patient.

Assume, for example, that a crossover patient fails to pay a $10 deductible and the provider bills Medi-Cal for $10 at a billing cost of $2. The state determines that the ceiling allows it to pay only $1. This enables the provider to recover $9 from Medicare in bad-debt reimbursement. The provider thus winds up recovering the full amount of the deductible. What is out of pocket-and what the Providers

323 F.3d 782                                                                                     Page 17
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003 Daily Journal D.A.R. 3033
**(Cite as: 323 F.3d 782)**

claim non-Medicare patients will have to cover-is the $2 billing cost. If billing costs are not otherwise reimbursed as an indirect cost of the service rendered, the Providers' argument leads to a conclusion that there is an impermissible cost shift of some amount every time the provider incurs a billing expense concerning a crossover patient.

Moreover, even if bad debt expense should be our focus when analyzing the Providers' cost shifting argument, the district court's position is untenable. The cost shifting provisions of the statute must be read together with the provision authorizing the Secretary to refuse to reimburse costs when the provider has failed to "furnish such information as the Secretary may request in order to determine the amounts due such provider." 42 U.S.C. § 1395g(a). Whenever the Secretary exercises this authority, there is a cost shift to non-Medicare patients of the same kind identified in the district court's opinion. We decline to attribute to Congress an intent that an impermissible cost shift occurs whenever a provider cannot, or does not, choose to tender the documentation required by the Secretary. To do so would eviscerate the Secretary's ability to verify that the cost is actually a necessary cost of a covered service. *Pasadena Hosp. Ass'n Ltd. v. United States*, 223 Ct.Cl. 72, 618 F.2d 728, 735 (1980) ("[I]f plaintiffs' argument [that the Secretary's determination that a cost is not reimbursable under his regulations occasions an impermissible cost shift] is to prevail, no cost could ever be disallowed for reimbursement purposes because to do so would tend to shift the cost to non-Medicare patients.").

### VIII. *Conclusion*

The judgment of the district court is REVERSED and this matter is REMANDED to it with instructions that summary judgment be entered in favor of the Secretary.

C.A.9 (Cal.),2003
Community Hosp. of Monterey Peninsula v. Thompson
323 F.3d 782, 03 Cal. Daily Op. Serv. 2380, 2003

Daily Journal D.A.R. 3033

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|

SUMMER HILL NURSING HOME, LLC

MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES;
and KERRY N WEEMS, ACTING ADMINISTRATOR for the CENTERS FOR
MEDICARE & MEDICAID SERVICES

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___88888___
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

John H. Korns
BUCHANAN INGERSOLL & ROONEY PC
1700 K Street, NW, Suite 300
Washington, DC 20006-3807
(202) 452-7939

Ira Daniel Tokayer
42 West 38th St , Suite 802
New York, NY 10018
(212) 695-5250

ATTORNEYS (IF KNOWN)

Jeffrey A. Taylor, U.S. Attorney
United States Attorneys Office
U.S. DEPARTMENT OF JUSTICE
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530
(202) 514-7566

Michael B. Mukasey
U.S. Attorney General
Office of the Attorney General
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 353-1555

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ A. *Antitrust*

☐ 410 Antitrust

○ B. *Personal Injury/
Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ C. *Administrative Agency
Review*

☒ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff))
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ D. *Temporary Restraining
Order/Preliminary
Injunction*

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

---

○ E. *General Civil (Other)*          OR          ○ F. *Pro Se General Civil*

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| ○  G. *Habeas Corpus/ 2255* | ○  H. *Employment Discrimination* | ○  I. *FOIA/PRIVACY ACT* | ○  J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○  K. *Labor/ERISA (non-employment)* | ○  L. *Other Civil Rights (non-employment)* | ○  M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. §1395oo(f)(1), 5 U.S.C. §702, and 28 U.S.C. §§1331 and 1346: Challenge to the decision of the CMS Administrator

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND:  YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE February 19, 2008   SIGNATURE OF ATTORNEY OF RECORD   *John H. Korns*

---

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.